**SHEERBONNET, LTD., Plaintiff,**

v.

**AMERICAN EXPRESS BANK, LTD., Defendant.**

No. 92 Civ. 7426 (LAP).

United States District Court, S.D. New York.

Oct. 24, 1995.

Jack P. Levin, Howard, Darby & Levin, New York City, for plaintiff.

## MEMORANDUM AND ORDER

PRESKA, District Judge:

Instructed by the Court of Appeals not to abstain from further determinations, *Sheerbonnet v. American Express Bank, Ltd.*, 17 F.3d 46 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994), I return to this case to address the remaining arguments in defendant's renewed motion to dismiss. The facts having been set out in my earlier order, as well as by the Court of Appeals, will only be summarized here. They should be considered retrospectively, in light of the seizure by the Superintendent of Banks of the State of New York ("Superintendent"), as part of a worldwide seizure in July of 1991, of the New York assets of the Bank of Credit and Commerce, S.A. ("BCCI"). The collapse of BCCI and the subsequent seizure of its assets has spawned a legion of lawsuits, of which this is but one.

### FACTS

Plaintiff Sheerbonnet, Ltd. ("Sheerbonnet") is a British trading company which contracted in 1990 to sell troop carriers to the Hady Establishment ("Hady"), a Saudi Arabian company. The carriers were to be used by Allied forces during the Persian Gulf War. For payment, Hady obtained an irre-

vocable $14,080,000 letter of credit from Banque Scandanave, in Geneva, Switzerland. Ten percent of this price was downpayment, the remainder due after delivery. After receiving the downpayment and fulfilling its obligations under the contract, Sheerbonnet awaited the balance, approximately $12.4 million, due on July 5, 1991.

Sheerbonnet requested that the payment be made through a funds transfer to its account at BCCI in London. Because Sheerbonnet was to be paid in U.S. dollars, Banque Scandanave initiated payment on July 3rd by instructing its correspondent bank in New York, Northern Trust International ("Northern Trust"), to transfer $12.4 million to American Express Bank ("AEB") for credit to BCCI's account at AEB in New York on July 5th.

On the morning of July 5th, regulators in England and Luxembourg suspended the operations of the faltering BCCI. On the same day in the United States, the Federal Reserve Bank advised AEB and other banks of the suspension of BCCI accounts worldwide, including the seizure of BCCI's New York operations. At 9:00 a.m., the Superintendent closed BCCI's New York Agency and announced the seizure of all "business and property" of BCCI in New York.

Shortly thereafter, AEB received by wire from Northern Trust the payment order for the transfer of $12.4 million to the BCCI account at AEB in New York. Knowing the account was frozen, AEB nevertheless credited to it the $12.4 million. Because of the freeze, these assets remained in New York.

After crediting the funds to the BCCI account, AEB asserted its rights over the entire account as an off-set against debts owed to it by the insolvent BCCI. The $12.4 million is thus in AEB's control, none of this money having ever reached Sheerbonnet.

The Superintendent, pursuant to New York Banking Law § 606(4)(a), thereafter began liquidation proceedings to dispose of BCCI's assets in New York. In March of 1992, the Superintendent petitioned the Supreme Court of the State of New York ("Liquidation Court") for an order compelling AEB and several New York banks to turn over any BCCI funds held in their accounts. A settlement agreement was reached, and the Liquidation Court entered a Turnover Order on April 27, 1992 instructing the banks to cede BCCI funds to the Superintendent, less set-offs claimed by the banks. Upon remittance, the Turnover Order provided that the banks would be "discharged from liability with respect to claims for funds of BCCI, S.A. located in New York." Having already claimed the BCCI London account as a set-off, AEB did not turn over any funds to the Superintendent.

In September of 1992, Sheerbonnet commenced suit against AEB in this Court. After motion by the defendant, I abstained from the case under the federal abstention doctrine enunciated by the Supreme Court in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). That order was reversed by the Court of Appeals, and defendant now renews its motion to dismiss.

## DISCUSSION

AEB has moved to dismiss the complaint on three grounds: (1) that Sheerbonnet has failed to state a claim upon which relief can be granted, under Fed.R.Civ.P. 12(b)(6); (2) that the claim is barred by a previous order of the Liquidation Court; and (3) that Sheerbonnet has failed to join an indispensable party, under Fed.R.Civ.P. 19. I will address these arguments in order. For the reasons set forth, I find each argument to be unpersuasive.

## I. Failure to State a Claim

AEB has offered two reasons why Sheerbonnet's claim fails to state a legally cognizable claim. The first is that Article 4–A of the New York Uniform Commercial Code provides the exclusive remedy for the type of injury alleged, and the complaint not only ignores Article 4–A but is inconsistent with several of its provisions. The question of the exclusivity of Article 4–A as a whole, or the preclusive effect of any of its parts, has yet to be directly addressed in this Circuit. The second reason offered by AEB is that Sheerbonnet's common law claims, even if not excluded by Article 4–A, are inadequate as a

matter of law. Neither position is supportable.

### A. NY—UCC Art. 4–A Does Not Bar Sheerbonnet's Claim

Effective as of January 1, 1991, Article 4–A is the latest addition to New York's Uniform Commercial Code. Its exact contours, its reach, and the implications of its various provisions have not yet been tested in state or federal courts. The provisions of Article 4–A are dense, and a preliminary discussion of their subject matter is helpful before addressing AEB's first argument for dismissal, grounded as it is on the purpose and scope of the provisions. Article 4–A governs "funds transfers" or "wire transfers." N.Y. U.C.C. § 4–A–102 (McKinney 1991). A by-product of new communications technology, funds transfers are a specialized "method of payment in which the person making the payment ('the originator') directly transmits an instruction to a bank either to make payment to the person receiving payment ('the beneficiary') or to instruct some other bank to make payment to the beneficiary." N.Y. U.C.C. § 4–A–104, Official Comment, at p. 561. A funds transfer is initiated by a "payment order," which is an instruction from the person making the payment to a "receiving" or "intermediary" bank to transfer the funds to the bank account of the beneficiary, normally in the "beneficiary's bank." N.Y. U.C.C. § 4–A–103. A payment order may pass through several banks on its route from the sender, or originator, to the beneficiary. A payment order must be for a fixed or determinable sum, must not state a condition for payment to the beneficiary other than time, must require the receiving bank to be reimbursed by debiting or otherwise receiving payment from the originator, and must be communicated directly to the receiving bank (as opposed to the originator's bank). See *id.* Furthermore,

> payment by the originator to the beneficiary is accomplished by providing to the beneficiary the obligation of the beneficiary's bank to pay. Since this obligation

arises when the beneficiary's bank accepts a payment order, the originator pays the beneficiary at the time of acceptance and in the amount of the payment order accepted."

N.Y. U.C.C. § 4–A–406, Official Comments, at p. 623.

Most often, funds transfers are made to discharge an underlying payment obligation which arose through earlier commercial dealings between the originator (*e.g.*, a purchaser of goods or services) and the beneficiary (*e.g.*, a provider of goods or services). Insofar as they facilitate the efficient, high-speed, low-cost, national and international transfer of huge sums of money, usually between sophisticated institutional parties, funds transfers have become an integral component of large business transactions.[1]

#### 1. Article 4–A is not Exclusive

■ Article 4–A responded to the growing use of funds transactions and the absence of a "comprehensive body of law—statutory or judicial—that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders." N.Y. U.C.C. § 4–A–102, Official Comment, at p. 559. The pastiche of laws—statutory, administrative and judicial—applied to funds transfers prior to Art. 4–A was found to be unsatisfactory. See *id.*

The drafting committee made "a deliberate decision . . . to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than rely on broadly stated, flexible principles." *Id.* AEB relies heavily on passages selected from the official commentary to support its argument that Article 4–A is the exclusive remedy for claims like Sheerbonnet's arising out of funds transfers:

> In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed

---

1. Transfer volume reaches $1 trillion daily; with an average peak day transfer of $5 million. *See Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 568 N.Y.S.2d 541, 546, 570 N.E.2d 189, 194 (Ct. of App.1991); *see also* M.I. Spak, "The Case

To Be Made for Proposed Article 4A of the Uniform Commercial Code: What's a Trillion Dollars Between Friends?," 80 Ky.L.Rev. 167 (Fall 1991).

by unique rules that address the particular issues raised by this method of payment. . . .

. . . The[se] rules . . . represent a careful and delicate balancing of [competing] interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

N.Y. U.C.C. § 4–A–102, Official Comments, p. 559.

These passages are the foundation for AEB's conclusion that "[b]ecause Sheerbonnet has not alleged that AEB violated any provision of Article 4–A, the Complaint has failed to state a cognizable cause of action and should be dismissed." Defendant's Memorandum of Law in Support of Renewed Motion to Dismiss, at 11. AEB's conclusion is unjustified for several reasons.

On their face, the above passages fail to establish a legislative intent to preclude any and all funds transfer actions not based on Article 4–A. A desire to start on a "clean slate" implies only that in drafting the Article, the legislature was neither borrowing from related U.C.C. regulations, such as Article 4 (Bank Deposits and Collections) or Article 3 (Commercial Paper), nor from principles of common law or equity. Clearly, parties whose conflict arises out of a funds transfer should look first and foremost to Article 4–A for guidance in bringing and resolving their claims, but the article has not completely eclipsed the applicability of common law in the area.[2] The exclusivity of Article 4–A is deliberately restricted to "any situation covered by particular provisions of the Article." Conversely, situations not covered are not the exclusive province of the Article. The legislative intent reflected here is that carefully drafted provisions, designed to bring uniformity, predictability, and finality to an increasingly important area of commercial law, are not be side-stepped when convenient by reference to other sources of law. But where the provisions do not venture, the claimant need not turn back; he or she may seek other guides, statutory or judicial. The only restraint on the plaintiff seeking such relief is that "resort to principles of law or equity outside of Article 4A" must not be inconsistent with provisions within the Article.

Commentators uniformly recognize that Article 4–A is not a hermetic legal seal over funds transfers. See J.J. White & R.S. Summers, Uniform Commercial Code, § 1–2, at p. 132 (1993 pocket part) ("With the adoption of Article 4A, electronic funds transactions are governed not only by Article 4A, but also common law, contract, Federal Reserve rules, Federal Reserve operating letters, rules of automated clearing houses, CHIPS and Title IX of the Federal Consumer Credit Protection Act.").[3] Professor White goes on to discuss how Article 4–A's

scope questions come in two basic forms. First—as to transactions partly covered by 4–A, but also partly covered by contract,

---

2. The Code's constructive and interpretive guidelines supports plaintiff's assertion that Article 4–A only extinguishes common law claims that are redundant of or inconsistent with its provisions. See N.Y. U.C.C. § 1–103 ("Unless displaced by the particular provisions of the Act, the principles of law and equity . . . shall supplement its provisions.") (incorporated into Art. 4–A by § 4–105(4)).

3. "CHIPS" is the New York Clearing House Interbank Payment System, a system of rules for funds transfers. Plaintiff argues, apparently, that CHIPS Administrative Procedure No. 3 was incorporated into the funds transfer at issue here. See Plaintiff's Memorandum of Law in Opposition to Renewed Motion to Dismiss, at 19–20. Section 4–A–501 provides that "a funds-transfer system rule governing the rights and obligations between participating banks using the system may be effective even if the rule conflicts with this Article and directly affects another party to the funds transfer who does not consent to the rule. A funds-transfer system rule may also govern rights and obligations of parties other than participating banks. . . ." N.Y. U.C.C. § 4–A–501(2). This argument cannot now be heard in light of plaintiff's earlier statement that "Sheerbonnet does not sue on a mere error in transmission, nor [sic] otherwise rest this action on violation of Article 4–A and CHIPS Administrative Procedure 3." Plaintiff's Memorandum of Law in Opposition to Defendant's Original Motion to Dismiss, at 12.

by CHIPS' rules or by Fedwire rules, or other law—which part is covered by 4A and which part by other rules? Second— as to transactions completely beyond Article 4A—which are these and what are their characteristics?"

White & Summers, § 1–2, at p. 133 (1993 pocket part). As explained elsewhere, "the Drafting Committee intended that Article 4A would be supplemented, enhanced, and in some places, superceded by other bodies of law. . . . the Article is intended to synergize with other legal doctrines." T.C. Baxter & R. Bhala, "The Interrelationship of Article 4A with Other Law," 45 Business Lawyer 1485, 1485. (1990) (describing eleven "points of contact" between the article and other law, including tort law).[4]

The Article itself is replete with references to common law remedies. Many sections borrow freely from the tort concepts of "ordinary care," "reasonableness," and "the law governing mistake and restitution." See, e.g., § 4–A–205(2) (the sender of an erroneous payment order who is notified by the receiving bank that the order was executed or the sender's account was debited has "a duty to exercise ordinary care . . . to discover the error"); § 4–A–404(2) (if payment order does not instruct notice from the beneficiary's bank to the beneficiary, notice may be by "any other means reasonable in the circumstances"); § 4–A–205 (if a payment order erroneously instructs payment in an amount greater than intended, the sender is not obliged to pay to the beneficiary the excess amount but the receiving bank is entitled to recover from the beneficiary "to the extent allowed by the law of mistake and restitution").[5]

Based on the foregoing, I conclude that Article 4–A of the New York Uniform Commercial Code is not the exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer.

## 2. Plaintiff's Allegations are not Inconsistent with Article 4–A

■ Having determined that Article 4–A is not an automatic bar to electronic funds transfers claims grounded elsewhere, the remaining question is whether Sheerbonnet's common law causes of action are nonetheless inconsistent with any of the Article's provisions and therefore must be dismissed. Neither the case law nor the specific provisions argued by AEB demonstrate such inconsistency.[6]

Typical of AEB's myopic argumentation on this point is its reliance on the New York Court of Appeals decision in *Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189 (Ct. of App. 1991). To support its assertion that "case law also rejects Sheerbonnet's limited vision of the reach of Article 4–A," Defendant's Reply Memorandum in Support of its Motion to Dismiss, at 7–8, AEB cites the pronounce-

---

4. Baxter and Bhala, however, argue somewhat ambiguously that these "points of contact" are selective, and that where not made explicit by the drafters, no contact with other law is intended. "Silence is the immune system the draftpersons gave to the body of Article 4A. To protect against the unlicensed importation of undesirable legal doctrines, the draftpersons omitted any mention of that which was not wanted." Baxter & Bhala, at 1486. I understand this passages to argue that when a provision is on point, and does not invite recourse to common law, then common law is not to be relied on; this is not to say that recourse to common law is foreclosed when there is no provision on point.

5. The rationale for allowing loss to shift from the sender to the receiving bank, as in § 4–A–205, has been attributed to the tort doctrine of "last clear chance." See Spak, at 208–09.

6. The parties have expended considerable energy briefing the applicability to this case of *In re*

---

*Bank of Credit and Commerce Int'l, S.A.,* Index no. 43170/91, slip. op. (Sup.Ct.N.Y.Co., Mar. 10, 1995), *reh'g denied,* slip op. (May 9, 1995) (hereinafter "CITIC"). There, Justice Friedman found that the knowing and selective crediting of a frozen BCCI account—when the funds credited could not be paid out from that account but would instead only increase the liquidation estate—was an *ultra vires* activity that must be unwound. Justice Friedman ordered the return of a post-seizure deposit of $31 million credited to a BCCI account in New York to the sending bank, which it found had been wrongfully deprived of those funds. Although CITIC does, by implication, undercut AEB's arguments that it owed no duty to Sheerbonnet and that its actions are protected by Article 4–A, its usefulness to today's analysis is limited because, *inter alia,* it does not directly address the preclusive effect of Article 4–A.

ment in *Banque Worms* that the National Conference of Commissioners on Uniform State Laws and the American Law Institute "undertook to develop a body of unique principles of law that would address every aspect of the electronic funds transfer process and define the rights and liabilities of all parties involved in such transfers." *Banque Worms,* 568 N.Y.S.2d at 547, 570 N.E.2d at 195. AEB fails to recognize, however, that the issue in *Banque Worms,* taken by the Court of Appeals as a certified question from the Second Circuit, was which of two common law doctrines, "discharge for value" or detrimental reliance, would be imported into Article 4–A to remedy an erroneous electronic transfer of funds. The Court ultimately decided that the "discharge for value" rule, the product of "a myriad of cases," *id.* 568 N.Y.S.2d at 545, 570 N.E.2d at 193, was the most appropriate supplement to Article 4–A because the most consistent with its policy goals. It reached this finding despite expressly noting that the Article did not invite an application of this judicially constructed rule:

> We believe such an application accords with the legislative intent and furthers the policy considerations underlying article 4–A of the New York Uniform Commercial Code. Although no provision of article 4–A calls, in express terms, for the application of the "discharge for value" rule, the statutory scheme and the language of various pertinent sections, as amplified by the Official Comments to the UCC, support our conclusion that the "discharge for value" rule should be applied in the circumstances here presented.

*Banque Worms,* 568 N.Y.S.2d at 548, 570 N.E.2d at 196. *See Banque Worms v. BankAmerica Int'l,* 928 F.2d 538, 541 (2d Cir.1991) (applying the discharge for value rule to the erroneous funds transfer); *see also Gen. Elec. Capital Corp. v. Central Bank,* 49 F.3d 280 (7th Cir.1995) (Easterbrook, J.) (following *Banque Worms* in the interest of national uniformity in the treatment of wire funds transfers). As the reasoning of our Court of Appeals and the New York Court of Appeals make clear, despite its exhaustive aspirations, Article 4–A has not completely filled the area of law sur-

rounding funds transfers. Common law and equitable principles, where they compliment the important policy considerations of the Article and are not inconsistent with any of its specific provisions, can and should be used to resolve conflicts between parties to this type of transaction.

In *Aleo Int'l, Ltd. v. Citibank N.A.,* 160 Misc.2d 950, 612 N.Y.S.2d 540 (Sup.Ct. N.Y.Co.1994), also relied on by AEB, plaintiff brought an action to recover funds which Citibank had transferred to a third party pursuant to instructions that the plaintiff unsuccessfully retracted. Citibank claimed not to have received the cancellation until payment had been accepted. The court dismissed the complaint, which alleged negligence, holding that "unless Citibank's failure to cancel [plaintiff's] transfer order was not in conformity with Article 4–A, plaintiff ... has failed to state a cause of action, and this action must be dismissed." *Aleo,* 612 N.Y.S.2d at 541. In its one-page opinion, however, the court was able to refer to two provisions of Article 4–A directly applicable to the facts alleged. Reference to § 4–A–211(2) (governing cancellation and amendment of payment orders) and § 4–A–209(2) (governing acceptance of payment orders), quickly demonstrated that, because the stop transfer order was received after the payment and acceptance had occurred, cancellation was ineffective, and Citibank bore no liability. *Id.* 612 N.Y.S.2d at 541. Were the allegations in this action so clearly circumscribed by applicable sections of Article 4–A, Sheerbonnet could not be heard to protest if its common law claims were dismissed on the pleadings. *Aleo* is an excellent example of how the underlying policies of Article 4–A—predictability, consistency, finality—are well-served by its clear and careful drafting. We are not so fortunate here.

As in *Aleo,* another recent State Supreme Court case resolved a dispute arising out of an allegedly erroneous funds transfer by reference to Article 4–A provisions directly on point. *See Southtrust Bank of Ala., N.A. v. Turkiye ve Ihracat Bankasi, A.S., et al.,* no. 116581/94 (Sup.Ct.N.Y.Co. Jan. 19, 1995). In *Southtrust,* plaintiff's bank relayed a payment order to American Express for the

transfer of $500,000 to the account of a creditor of the plaintiff. The order included correct verbal instructions, but an erroneous written account number. It was into this wrong account that American Express transferred the $500,000. Neither American Express nor the holder of the account into which the funds were sent agreed to return the funds to plaintiff, who in turn sought unsuccessfully to have the funds garnished. As in our facts, American Express in *Southtrust* used the funds which it credited as a set-off against debts owed to it by the account holder. *Southtrust,* slip op. at 3–4.

The court dismissed plaintiff's complaint, based in negligence, and denied leave to amend to substitute other common law tort claims which it said were inconsistent with Article 4–A. Again the court was able to point to specific provisions with which the plaintiff's tort theories conflicted.[7] The section on point, which eclipsed plaintiff's claims no matter how they were styled, was § 4–A–207 ("Misdescription of a Beneficiary"). Clearly from the language of the section, American Express was entitled to rely on the representation of the account number as it appeared on the payment order it received, even if that number conflicted with the accompanying description of the account. *Id.* at 10. Only because it ignored this plainly applicable and inconsistent provision was plaintiff's complaint dismissed.

Further distinguishing *Southtrust* from this case was American Express's ability to argue lack of knowledge. Plaintiff in *Southtrust* could not prove that American Express was aware of the discrepancy between the account number and its description. In the instant case, however, AEB's knowledge of the insolvency and seizure of BCCI's accounts—before accepting the Northern Trust payment order and crediting the BCCI London account—is undisputed. Nor was the sender in our case responsible for conveying an erroneous order or tardy cancellation. AEB's knowledge that the $12.4 million it

was asked to receive and transfer was destined for a seized account seems relevant to its decision to accept the order and credit the frozen account, but there is no provision in Article 4–A dealing with such circumstances.

AEB fares no better in direct reliance on specific provisions of Article 4–A, three of which it argues are inconsistent with, and thus preclude, Sheerbonnet's theory of tort liability.

■ First, AEB argues that § 4–A–209 is both applicable and inconsistent insofar as it gives the receiving bank full discretion to accept or reject a payment order. See Defendant's Memorandum of Law in Support of Renewed Motion to Dismiss, at 13–14. Since it is granted full discretion, AEB argues that it would be inconsistent to impose tort liability for the acceptance of the payment order. The intent of granting this discretion is explained in the commentary, however, which stresses the receiver's ability to *reject* the order: "Section 4A–209 is based on a general principle that a receiving bank is not obliged to accept a payment order unless it has agreed or is bound by a funds transfer rule to do so. Thus, provision is made to allow the receiving bank to prevent acceptance of the order." N.Y. U.C.C. § 4–A–209, Official Comments, at p. 593. Section 4–A–209 is primarily devoted to describing how and when acceptance, and the liability attendant to it, occurs—not to how and when a receiving bank's discretion should be exercised. There is no indication that such discretion is meant to serve as a veil against liability for the manner in which the discretion to accept is exercised. A payment order is merely a request by the sender that the receiving bank pay or execute the order. With acceptance of an order comes certain obligations. A receiving bank may refuse requests which would expose it to unreasonable high risk of loss—as when there does not seem to be adequate funds to cover the order. It can hardly promote the purposes of Article 4–A

---

7. Prefacing its analysis by flagging the intention of Article 4–A's drafters to work off a clean slate and exclusively determine the rights and obligations of parties in situations covered by its provisions, the court goes on to say that proposed pleadings outside of Article 4–A must be scrutinized not in light of an absolute bar on their being brought (which would require no scrutiny) but rather in "light of the clear intention of the drafters of Article 4–A *to limit strictly* the resort to common law and equitable principles." *Southtrust,* slip op. at 7 (emphasis added).

to equate a general discretion to accept or reject payment orders with a ban on judicial inquiry into the circumstances under which that discretion was exercised and what followed its exercise.

■ AEB also looks to § 4–A–212 as a shield from Sheerbonnet's claims. This section governs the "Liability and Duty of Receiving Bank Regarding Unaccepted Payment Order." Specifically, AEB relies on a part of the provision which reads that, "[a] receiving bank . . . owes no duty to any party to the funds transfer except as provided in this Article or by express agreement." N.Y. U.C.C. § 4–A–212. First, in full context this section indicates that (1) no liability attaches to a receiving bank before it accepts a payment order, (2) absent an express agreement to the contrary, the receiving bank is not obliged to accept the order, and (3) the receiving bank is not an agent of any party to the funds transfer and hence, outside its acceptance of the order, owes no intrinsic duty stemming from an agency relationship. See id.; N.Y. U.C.C. § 4–A–212, Official Comments, at p. 602; White & Summers, at § 3–5 (1993 pocket part). Second, it is not clear whether this section applies to banks that are acting as *both* a receiving bank and the beneficiary's bank, as AEB argues it was. See Defendant's Reply Memorandum in Support of Renewed Motion to Dismiss, at 5. Third, and perhaps most telling, § 4–A–212, governing liability for unaccepted payment orders, should be read in tandem with § 4–A–210, governing rejection of payment orders. Section 4–A–210 indicates that, if not constrained by agency principles, receiving banks cannot conduct their business with blinders on to extenuating circumstances. Comment 1 to § 4–A–210 reads in part:

> In some cases, the receiving bank may not be able to carry out the instruction because of equipment failure, credit limitation on the receiving bank, *or some other factor that makes proper execution of the order infeasible.* In those cases notice of rejection is a means of informing the sender of the facts so that a corrected payment order can be transmitted or the sender can seek alternate means of completing the fund transfer.

N.Y. U.C.C. § 4–A–210, Official Comment, at pp. 595–96.

■ The final section relied on by AEB to bar Sheerbonnet's claim as inconsistent is § 4–A–502, governing set-offs. This section is inapplicable in light of the pleadings. AEB argues that it is expressly entitled to set off any funds credited to BCCI's account against debt owed to AEB by BCCI. It is correct in this assertion. See N.Y. U.C.C. § 4–A–502(3)(a) ("If a beneficiary's bank has received a payment order for payment to the beneficiary's account . . . (a) The bank may credit the beneficiary's account. The amount credited may be set off against an obligation owed by the beneficiary to the bank. . . ."). Sheerbonnet does not challenge AEB's right to a set-off, however. Instead, it challenges AEB's preliminary decision to *credit* the BCCI account. As stated in Sheerbonnet's Brief on Appeal to the Court of Appeals on the issue of abstention:

> 2. *The Conversion Here Was the Wrongful Credit, Not American Express's Attempted Setoff.*
>
> . . . The conversion alleged by Sheerbonnet in this action is the purported crediting of funds to the BCCI London account; American Express's attempted setoff was at most the motive for the wrongful "credit," and is not even mentioned in Sheerbonnet's complaint.

Reply Brief of Plaintiff–Appellant, at 12.

Whether AEB's set-off was in bad faith, as Sheerbonnet later alleged, is immaterial at this juncture. For purposes of this motion, Sheerbonnet's claim that AEB's crediting of the BCCI account was an intentionally tortious and unjustly enriching act is not inconsistent with the provisions of § 4–A–502 regarding set-offs and therefore is not barred by it.

Unlike *Aleo* or *Southtrust*, the allegations here and the circumstances giving rise to them do not fit neatly into any of Article 4–A's "precise and detailed rules." The rules of the article are transactional, aimed essentially at resolving conflicts created by erroneous instruction or execution of payment orders, whether by the originator, by an intermediary or receiving bank, or by the benefi-

ciary's bank. A major objective is to reduce and control risks that arise in payment systems by defining when and how rights and obligations are incurred and discharged. As organized by the article, funds transfer errors fall into three main categories. Errors may occur during the issuance and acceptance of the payment order—as when a payment order is made for the wrong amount, or identifies the wrong beneficiary, or, as in *Aleo,* is untimely cancelled. Errors may also occur during the execution of the payment order by the receiving bank—as when the originator's instructions are not followed, or the order is executed late, or is issued in an improper amount, or is not executed at all. Errors may also stem from payment issues— as in the obligation of the originator to pay the receiving bank, of the beneficiary's bank to pay the beneficiary, and notification of payment and discharge of duties requirements. None of these three areas, nor any of Article 4–A's miscellaneous provisions, directly addresses the allegations here.[8]

Sheerbonnet does not complain of an erroneous instruction or execution in the processing of Northern Trust's payment order, causing it to be credited to the wrong party, or in the wrong amount, or at the wrong time. Ironically, we are here now because AEB apparently followed its instructions to the letter. Sheerbonnet argues that in light of the unprecedented and superceding seizure of BCCI, AEB's decision to credit the BCCI London account, knowing that it was frozen and knowing that AEB would use these very funds as a $12.4 million set-off against BCCI's debt to AEB, was an exercise in self-serving, tortious tunnel vision. AEB did not ask either the originator or the beneficiary how they would like to proceed in light of the seizure, nor did it confer with the Superintendent of Banks.

There is no doubt, as Sheerbonnet contends, that the global seizure of BCCI was an unprecedented event that tests the limits of Article 4–A in a novel way. More at issue is whether AEB, seizing on the seizure, unfairly capitalized on this event. As plead, it appears that AEB was at least in a position to do so, functioning as it was as both the receiving bank and the beneficiary's bank. As the receiving bank, AEB had full discretion to accept or deny the payment order; as the beneficiary's bank AEB had full discretion to off-set against debts owed to it by the beneficiary. In isolation, these two provisions of Article 4–A are clear, harmonious, and equitable. But when linked in a transaction through a single entity, and placed in the crucible of the BCCI insolvency and seizure, the clarity, harmony, and equity fracture. The separate links of the funds transfer at issue here are whole, yet the chain was broken. Sheerbonnet agreed to sell troop carriers to Hady, on the basis of an irrevocable letter of credit issued by Banque Scandanave. The carriers were delivered. Sheerbonnet had an account with BCCI in London, which it wished credited in fulfillment of the letter of credit. Banque Scandanave directed its correspondent bank in New York, Northern Trust, to credit BCCI's London account through AEB in New York. Northern Trust so instructed AEB. AEB so credited the (frozen) BCCI London account. AEB then set-off the credit against BCCI debts.

When the electronic transfer was "completed," step-by-step according to Article 4–A, only one element was missing: the seller was never paid for its goods. The irony of this was not lost on the Court of Appeals. "Thus, the money originally destined for Sheerbonnet ended up not in the hands of the buyer or seller, but of a bank whose only role was to transfer the funds." *Sheerbonnet,* 17 F.3d at 48.

---

**8.** AEB argues that Article 4–A provides for the insolvency of parties to a funds transfer and thus this action must be brought under its provisions if it is to be brought at all. Defendant's Reply Memorandum in Support of Renewed Motion to Dismiss, at 8–9. The sections AEB cites, however, § 4–A–402(5) (governing the obligation of the sender to pay the receiving bank, specifically when an intermediary bank is unable to refund payment "because the bank suspends payments")

and § 4–A–210(3) (governing the rejection of payment orders, specifically when "a receiving bank suspends payments, all unaccepted payment orders issued to it are deemed rejected at the time the bank suspends payments") are inapposite, neither helpful in addressing the insolvency of the beneficiary (bank) prior to transfer, nor in preclusive conflict with the current causes of action.

A further peculiarity manifest in these facts is that under the terms of the payment order BCCI is itself the beneficiary, not Sheerbonnet. See Defendant's Reply Memorandum in Support of its Motion to Dismiss, at 5, discussing Sheerbonnet's Complaint, ¶ 13(f)–(g). What agreement existed between BCCI and Sheerbonnet for final payment is beyond the pleadings. Thus, although in the real world Sheerbonnet was to be the "beneficiary" of the $12.4 million, in the electronic world of funds transfers it was BCCI—and that has made all the difference. When the intended beneficiary became insolvent, the normal payment process was disrupted. When AEB off-set against BCCI debts, the credit to that account initiated by Hady and destined for Sheerbonnet was effectively pulled back, as if on an electronic string, before it was within Sheerbonnet's grasp. Professor White, in a discussion of issues that could interfere with the completion of a funds transfer, calls the insolvency of one of the banks within the system during a funds transfer the "least likely of all" scenarios and "the bank equivalent of nuclear holocaust." White & Summers, § 2–1, at p. 146 (1993 pocket part). He, like Article 4–A, does not even raise the specter of the insolvency of the beneficiary itself.[9]

As in *Banque Worms*, these circumstances, not specifically provided for in an otherwise thorough statutory scheme, demand resort to other legal principles in order to reach a fair resolution. Article 4–A is an attempt to balance competing interests, namely "those of the banks that provide the funds transfer services and the commercial and financial organizations that use the services, as well as the public interest." N.Y. U.C.C. § 4–A–102, Official Comment, at p. 559. A necessary risk taken by the drafting committee in eschewing "broadly stated, flexible principles" in favor of "precise and detailed rules" is that maneuvering among these competitors will eventually land them somewhere in between precise rules, and dependent on broader principles to resolve their conflict. This is such a case.

Article 4–A is a thorough but not exhaustive legislative treatment of funds transfers. Nevertheless, resort to judicial or other legal principles is prohibited if those principles conflict with any discrete components of the statutory scheme. Sheerbonnet's common law claims, based in tort and equity, do not conflict with any of Article 4–A's provisions. In fact, in the context of the circumstances giving rise to them, these claims compliment primary policy goals of the Article, including consistency, predictability, finality, and the fair allocation of risk. For the foregoing reasons, defendant's motion to dismiss for failure to bring this claim under Article 4–A is denied.

### B. Plaintiff's Common Law Claims Are Legally Cognizable

AEB argues in the alternative that "[e]ven if not preempted, Sheerbonnet's tort and equity causes of action should be dismissed for failure to state a cognizable claim." Defendant's Reply Brief in Support of Renewed Motion to Dismiss, at 17. AEB claims that it only did what it was instructed and entitled to do and therefore cannot have any liability as a matter of law. This approach misses the forest for the trees.

Freed from the confines of Article 4–A, Sheerbonnet's claims—conversion, tortious interference with contract, unjust enrichment—all turn in varying degrees around one narrow question: what is the standard of care that is to be exercised by a receiving bank, also serving as the beneficiary's bank, in the handling of a payment order to be credited to the seized account of an insolvent bank that is also the beneficiary of the payment order—particularly when the crediting of the frozen account will have the effect of

---

9. Even commentary addressed expressly to the effect of insolvency on funds transfers does not account for the bankruptcy of the beneficiary. See N.R. Nelson, "Settlement Obligations and Bank Insolvency," 45 Bus.Law. 1473 (1990) (summarizing the "overall allocation of insolvency risk" according to two principles: (1) if the funds transfer has been completed ... "the insolvency risk is that the party that sent a payment order to the receiving bank fails [becomes insolvent] before it has paid the receiving bank. In other words, the insolvency risk is on the receiving bank to which the insolvent bank sent the payment order," and (2) if the funds transfer has not been completed ... "the insolvency risk is that a receiving bank which has already received payment fails"—neither of which conform to the present circumstances.)

increasing the receiving/beneficiary's bank offset against debts owed to it by the beneficiary, thus ensuring that the transferred funds will not in fact reach the beneficiary?

The absence of language in Article 4–A expressly restraining AEB from completing the transfer, and the allegedly porous restrictions attending the Supervisor's seizure of BCCI accounts no more vitiates Sheerbonnet's claims than does AEB's protestation that it was simply following orders. Plaintiff has made out a prima facie claim on each of cause of action.

## II. This Action Is Not Barred By The Liquidation Court's Turnover Order

■ AEB argues that a 1992 Turnover Order from the Liquidation Court bars the present action, presumably under the doctrine of *res judicata*. This argument is not supportable, and Sheerbonnet's claims are not precluded.

After seizing BCCI assets in New York on July 5, 1991, the Superintendent, exercising his powers under New York Banking Law § 606(4)(a), petitioned the Liquidation Court for an order compelling nine banks in possession of BCCI funds deposited in New York to surrender those funds.[10] After the banks and the Superintendent reached a settlement agreement in March of 1992, notice of settlement was given and a hearing was held on the proposed settlement terms. A Turnover Order was then entered by Judge Dontzin of the New York State Supreme Court on April 27, 1992. See *In re Bank of Credit and Commerce Int'l, S.A.*, no. 43170/91 (April 27, 1992) ("Turnover Order"). Under the terms of the order, the banks were to turn over to the Superintendent all funds from BCCI accounts in New York, less any claimed setoffs.

The order directed that in return for remitting the BCCI funds to the Superintendent, and to overcome the banks' reluctance to do so for fear of exposing themselves to lawsuits filed by third parties claiming an interest in the funds, those banks would be "discharged from liability with respect to claims for funds of BCCI, S.A. located in New York" and

> that upon turnover by each Bank of funds pursuant to this Order, and provided that such Bank has complied fully with the terms of this Order, this Court permanently enjoins all persons and entities from asserting any claim or cause of action against such Bank for funds of BCCI, S.A. located in New York."

Turnover Order at 6.

AEB argues that the discharge and injunction ordered by the Liquidation Court bars this action. The discharge and injunction are not without limit however; they begin and end with the turnover of funds to which they correspond. There is no discharge of liability as to any monies except those turned over, and there is no injunction against any third parties except those staking a claim to the turned over funds, that is, the "funds of BCCI, S.A." As made clear by the Court of Appeals when it scrutinized the plaintiff's complaint, Sheerbonnet stakes no such claim and asks for no such monies. *See Sheerbonnet,* 17 F.3d at 49–50.

Sheerbonnet's causes of action sound in tort, in particular: conversion, unjust enrichment, and tortious interference with contract. In relief, Sheerbonnet seeks damages for AEB's allegedly faulty banking practices. In ruling that the nature of these claims did not necessitate my abstention in favor of disposition in a state proceeding, the Court of Appeals clearly separated the merits of this case from the state liquidation of BCCI's New York accounts. "Because the claims in this case are addressed to American Express' banking conduct, they do not belong in the Liquidation Court." *Id.* at 49. Rejecting AEB's argument that Sheerbonnet's tort claims should be resolved by the Liquidation Court, the Court noted that:

> the proceedings involve different subject matters and different forms of relief.... the issues presented here—tort claims

10. The banks were: Bayerische Vereinsbank AG; Bank of New York; Security Pacific International Bank; Industrial Bank of Japan Trust Company; Bank of California International; First American Bank of New York; Marine Midland Bank; Citibank NA; and American Express Bank.

against American Express—differ from those pressed before the Liquidation Court—creditor's claims of entitlement to BCCI's assets. [citation omitted]. While the Liquidation Court is the proper forum for claims that might affect the *res* being administered by the Superintendent, in this case, Sheerbonnet seeks tort damages from American Express, and the outcome of its claims will have no impact on the state liquidation proceeding.

*Id.* at 50.

The Turnover Order is not so sweeping as to bar a claim simply because it arises out of transactions involving a frozen BCCI New York account. Sheerbonnet does argue that AEB should not have credited its $12.4 million payment from Hady to a seized BCCI account, but it does not seek to recover the funds from that account. It instead seeks damages from AEB for its allegedly tortious conduct. Thus, although due full faith and credit from this court under 28 U.S.C. § 1738, *see Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980), such credit is given to a state court judgment only where it is due. This action, and the remedy sought, do not fall within the scope of the order and thus are not precluded by it.

 Even if this action did fall within the scope of the Turnover Order, claim preclusion would not be appropriate. A federal court must give the same preclusive effect to decisions of state courts as would other courts within that state. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 80, 104 S.Ct. 892, 895–96, 79 L.Ed.2d 56 (1984). Under New York law, a party is precluded from raising a claim that was raised or could have been raised in a prior proceeding, when the claim arises from the same set of facts or underlying transactions. *See Reilly v. Reid,* 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978); *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993). Before a claim is precluded, it must be shown that the claimant had a full and fair opportunity to litigate the matter, that there is an identity of issues and parties in the earlier and later proceedings, and that the claim was necessarily decided on the merits in the earlier action. *See Hill v. Coca Cola Bottling Co. of New York,* 786 F.2d 550, 552–53 (2d Cir. 1986); *Bd. of Educ. of Manhasset Union Free Sch. Dist. v. New York State Human Rts. App. Bd.,* 106 A.D.2d 364, 482 N.Y.S.2d 495, 496 (2d Dep't 1984) (citing *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487 (Ct. of App.1984), *Schwartz v. Pub. Adm'r,* 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (Ct. of App. 1969)).

 Without addressing the identity-of-issues and necessarily-decided-on-the-merits elements, both of which are lacking in light of the above analysis, it is clear that Sheerbonnet was also not afforded a full and fair opportunity to have its claims heard by the Liquidation Court. *See Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 492 N.Y.S.2d 584, 588, 482 N.E.2d 63, 67 (Ct. of App.1985). The Liquidation Court turnover order was the product of a settlement reached between the Superintendent and the nine banks holding frozen BCCI monies. In return for surrendering those funds, the order served as a prophylactic interpleader, providing the banks with a shield from later claims to the funds. Notice of the proposed settlement order was given, and opposition to it was invited at a settlement hearing which Sheerbonnet did not attend. As AEB notes, these "objections were carved out for a separate hearing." Defendant's Memorandum of Law in Support of its Motion to Dismiss, at 21.

Even had Sheerbonnet responded to the notice and attended the hearing, which it chose not to do, it would not have had a full and fair opportunity to litigate its tort claims—nor was the Liquidation Court a proper forum for doing so. *Res judicata* will not apply when "the initial forum did not have the power to award the full measure of relief sought in the later litigation." *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir. 1986); *see Tribune Co. v. Purcigliotti,* 869 F.Supp. 1076, 1102–03 (S.D.N.Y.1994) (*res judicata* does not bar plaintiffs' unjust enrichment brought in federal court against defendants whose claims settled before the Workers' Compensation Board because the

Board lacks the jurisdiction to hear unjust enrichment claims), *aff'd,* 66 F.3d 12 (2d Cir. 1995); *Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1387, 1392 (E.D.N.Y.1989) (*"res judicata* does not apply if the prior adjudicatory body lacked subject matter jurisdiction over the claims asserted in the later action"), *aff'd,* 907 F.2d 1295 (2d Cir.1990). In the underlying action, the Liquidation Court, even if asked, was not in a position to address or provide full relief for Sheerbonnet's tort claims. Furthermore, Sheerbonnet had no cause to contest the turnover of BCCI funds to the Superintendent, since it was not making a claim to those funds.

The lack of both a full and fair opportunity to litigate and an identity of issues necessarily decided prevent a finding of res judicata even under New York's pragmatic "transactional analysis test," which bars claims that are "coterminous with the transaction or series of transactions from which the earlier claims arose." *Couri v. Westchester Country Club, Inc.,* 186 A.D.2d 715, 589 N.Y.S.2d 494, 496 (2d Dep't 1992) (citations omitted); *see Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). As stated above, the Turnover Order does not, and was not designed to, bar a claim simply because it is related to the seizure of BCCI assets in New York. If that were the case, the multiplicity of litigation spawned by that seizure would thereby have been swallowed in its entirety by the Liquidation Court. In light of the salient differences between this action and the Liquidation Court proceeding, a transactional analysis also fails to identify "the same gravamen of the wrong upon which the action is brought." *Reilly,* 407 N.Y.S.2d at 648, 379 N.E.2d at 175.

It can hardly be said that barring Sheerbonnet's current claim serves the primary purposes of the doctrine of res judicata: to prevent repetitive litigation, to promote judicial economy, and to provide for certainty in legal determinations. *See, e.g., Cahill v. Arthur Andersen & Co.,* 659 F.Supp. 1115, 1120 (S.D.N.Y.1986), *aff'd,* 822 F.2d 14 (2d Cir. 1987).

## III. The Superintendent Is Not A Necessary Party

■ AEB moves under Fed.R.Civ.Pro. 12(b)(7) for dismissal for failure to join a necessary party pursuant to Fed.R.Civ.Pro. 19. Rule 19(a) requires joinder of a party, when joinder will not deprive the court of subject matter jurisdiction, if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.Pro. 19(a).

AEB explains its evocation of Rule 19, specifically Rule 19(a)(2)(ii), as follows:

> In this action, Sheerbonnet must establish that it—and not some other party—is entitled to the funds credited to the BCCI Account. The Superintendent, however, has recovered from AEB the net balance in the BCCI Account and has challenged the setoffs taken by AEB against that Account. [citation omitted]. In light of this conflict, if the Superintendent were not joined as a party, AEB could not receive complete relief in this proceeding and would be exposed to a substantial risk of multiple liability.

Defendant's Memorandum in Support of its Motion to Dismiss, at 23.

AEB's fear of exposure to multiple and conflicting judicial determinations stems from its mischaracterization of the nature of this action. Properly characterized, this action does not require the joinder of the Superintendent for just adjudication.

As made clear by the Court of Appeals, and as discussed above, this action is not about the funds that were frozen in the BCCI New York account, nor about AEB's right as a creditor of BCCI to offset from those funds against BCCI's debt, nor about the Superintendent's right to seize, liquidate, demand the turnover of or otherwise contest

the legitimacy of setoffs against BCCI funds in New York. Sheerbonnet brings this action seeking relief from allegedly tortious conduct by AEB in its banking practices, conduct which precipitated but is distinct from AEB's claimed right to a setoff, for which Sheerbonnet seeks monetary relief.

AEB states that the Superintendent "has challenged the setoffs taken by AEB against [the BCCI] Account." Defendant's Memorandum of Law in Support of its Motion to Dismiss, at 23. This statement is followed by a citation ("*See* Baio Aff. ¶ 7 and Exh. G") to an exhibit of a summons with notice which evidences a suit *brought by AEB against the Superintendent* and the New York Agency of BCCI, challenging the Superintendent's rejection of over $30 million in setoffs against BCCI funds claimed by AEB, and seeking a declaratory judgment as to it rights and entitlement to damages. If, when and to what extent AEB is entitled to offsets against BCCI funds, questions that all center around AEB's prior banking relationship with BCCI, is the gravamen of the action described. A determination in the present action as to whether AEB did or did not engage in tortious banking practices in regard to its handling of the Northern Trust payment order, and the extent, if any, of the damages sustained by Sheerbonnet because of such conduct, do not implicate the interests of the Superintendent. A determination here will neither impair or impede the Superintendent's ability to protect his interest in contesting AEB's claimed offset, nor will it subject AEB to multiple, inconsistent judicial outcomes by reason of the Superintendent's claimed interest in the BCCI offset. This action may therefore continue without the joinder of the Superintendent.

### CONCLUSION

AEB's motion to dismiss is denied in all respects.

SO ORDERED: