**CENTRE–POINT MERCHANT BANK LIMITED, Plaintiff,**

v.

**AMERICAN EXPRESS BANK LIMITED, Defendant.**

**No. 95 Civ. 5000 (LMM).**

United States District Court, S.D. New York.

Jan. 9, 1996.

Lillick & Charles, Samuel N. Reiken, Parsippany, New Jersey, for Plaintiff.

Andrews & Kurth L.L.P., Lynne M. Fischman Uniman, Maura Fecher Carlin, New York City, Lorretta R. Pitt, Senior Counsel, FDIC, Thomas L. Holzman, Counsel, FDIC, Washington, DC, for Defendant.

**204**

### MEMORANDUM AND ORDER

McKENNA, District Judge.

Defendant American Express Bank Ltd. ("Amex") moves to dismiss counts I, II, IV, V, VI and VII of Plaintiff Centre–Point Merchant Bank Limited's ("Centre–Point's") Complaint pursuant to Fed.R.Civ.P. 12(b)(6). Centre–Point brings a number of common law tort and contract claims, as well as a claim under New York's Uniform Commercial Code ("UCC") (count III). The claims arise from Amex' failure to debit Centre–Point's account and reinvest the funds, as instructed by telex, and Amex' wire transfer of $702,976.63 from Centre–Point's account at Amex, pursuant to a fraudulent payment order. Amex argues that only the UCC claim is legally cognizable. At issue is whether UCC Article 4–A provides Plaintiff's exclusive remedy, pre-empting Centre–Point's other common law claims. Alternatively, Amex argues that the negligence counts and the breach of good faith and fair dealing claim should be dismissed as duplicative. The Court grants Defendant's motion to dismiss in part and denies it in part. The motion to dismiss is granted as to counts II, IV, VII and as to the portions of counts V and VI which concern Amex' alleged security breach (¶¶ 64–66, 70–72). The motion to dismiss is denied as to count I and as to the remaining portions of counts V and VI.

### I.  Background

In March of 1989, Centre–Point, a Nigerian bank, entered into a Telegraphic Test Key Agreement (the "Agreement") with Amex, a New York bank. The agreement addressed security precautions required for the handling of financial transactions by telex. (Compl. at ¶¶ 1–2, 5.) Roughly three years later, in April of 1992, Centre–Point opened an investment account with Amex. The account required Centre–Point to telex rollover instructions at regular intervals, initially every 30 days, but eventually every 90 days, indicating whether and how the money should be reinvested. (Compl. at ¶ 6.)

On August 18, 1993, Centre–Point instructed Amex by telex to debit its account in the sum of $1,598,226.93 and to invest the same on a 90–day fixed deposit. (Compl. at ¶ 10.)

Amex confirmed by telex that it had received and complied with this direction the following day, August 19, 1993, at approximately 5:00 P.M. (Compl. at ¶ 11.) Upon examining the confirmation, Centre–Point realized that Amex had incorrectly stated the maturity date as December 20, rather than November 20, and by telex dated August 20, 1993, at approximately 3:15 P.M., advised Amex of the discrepancy. (Compl. at ¶ 12.) Amex acknowledged the error by telex on August 21, 1993, at approximately 2:00 P.M., and confirmed that the investment would mature on November 20, 1993. (Compl. at ¶ 13.) Centre–Point now alleges that contrary to the confirmatory representations, Amex never debited the account on August 19 and never reinvested the money. (Compl. at ¶ 14.)

Centre–Point subsequently learned that two fraudulent payment orders were made against its account following its reinvestment order of August 18. (Compl. at ¶ 17.) Allegedly, Amex received a fraudulent telex at 4:58 P.M. on August 19, purportedly canceling Centre–Point's investment order of the previous day and advising Amex to await further instruction. (Compl. at ¶ 25.) This telex arrived two minutes before Amex sent its telex confirming receipt and compliance with the rollover instructions. The first fraudulent payment order arrived later that day and was honored, but subsequently returned due to deficiencies in the alpha-numeric account number provided. (Compl. at ¶¶ 18, 26.) Amex, however, paid the second fraudulent order to an off-shore account on August 20, in the amount of $702,976.63. (Compl. at ¶¶ 19, 27.) Centre–Point argues that if Amex had properly debited its account pursuant to its August 18 instruction, there would not have been funds available in the account to be drawn upon by the fraudulent payment order.

Centre–Point further asserts that Amex knew or should have known that its security procedures were susceptible to such a breach, particularly since Amex knew that others of its Nigerian bank customers had been victimized in a similar manner. Amex failed to advise Centre–Point of these security concerns and, in addition, failed to follow

its customary practice of contacting Centre–Point by telephone to confirm its instructions, despite having received contradictory instructions by telex. Amex also allegedly failed to confirm the fraudulent debits by telephone or telex, despite having already sent notice to Centre–Point that it had reinvested the funds in the account.

As a consequence of these transactions, Centre–Point has brought a seven count complaint against Amex. It charges Amex with breach of contract (count I) and negligence (count II) for failing to debit its account and reinvest the funds as instructed and agreed. It also brings charges alleging breach of the UCC (count III) and negligence (count IV) for failing to provide a commercially reasonable security procedure given all of the relevant factors. In addition, it alleges fraud and fraudulent concealment (count V) and negligent misrepresentation (count VI) for falsely stating that AMEX had debited Centre–Point's account and for failing to state that it had received contradictory telexes and had paid on subsequent payment orders. Finally, Centre–Point charges that all of these events amounted to a breach of duty of good faith and fair dealing (count VII).

Amex seeks to dismiss all but the UCC count, asserting that the dispute involves a wire transfer, and that UCC Article 4–A provides the exclusive remedy for such disputes. Alternatively, Amex contends that the negligence counts and the breach of duty of good faith and fair dealing count are duplicative.

## II. Discussion

■■■ Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), which provides that a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted." In the course of resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court reads the complaint generously, accepting the truth of, and drawing all reasonable inferences from, the well-pleaded factual allegations. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *accord California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642

(1972); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993); *Allen v. West-Point–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991).

> When determining the sufficiency of plaintiff[s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in ... [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit. *Brass,* 987 F.2d at 150 (*citing Cortec,* 949 F.2d at 47–48).

The Court will only dismiss a complaint for failure to state a claim when the Court finds beyond a reasonable doubt that Plaintiff "can prove no set of facts" to support the claim that Plaintiff is entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

■■■ The Court is required to draw all reasonable inferences in Plaintiff's favor, but not all possible inferences. *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 58 (1st Cir.1990). Only when "the suggested inference rises to what experience indicates is an acceptable level of probability," must the Court accept it as fact for pleading purposes. *Id.* at 52.

### A. Applicability of UCC Article 4–A

Article 4–A of New York's UCC remains relatively uncharted territory. Effective as of January 1, 1991, it governs "funds transfers" or "wire transfers," "a method of payment in which the person making payment (the 'originator') directly transmits an instruction to a bank either to make payment to the person receiving payment (the 'beneficiary') or to instruct some other bank to make payment to the beneficiary." N.Y. U.C.C. Law § 4–A–104, Off.Com., at p. 561 (McKinney 1991). "The scope of Article 4–A is determined by the definition of 'payment

order' and funds transfer.'" N.Y. U.C.C. Law § 4–A–102, Off.Com., at p. 559 (McKinney 1991). A payment order is a sender's instruction to a receiving bank to pay, or cause another bank to pay, a fixed amount of money to a beneficiary without any condition other than time of payment. The receiving bank must be reimbursed by debiting the sender's account and the sender's instruction must be transmitted directly to the bank. *See* N.Y. U.C.C. Law § 4–A–103 (McKinney 1991). A funds transfer is the series of transactions, beginning with a payment order, made for the purpose of making payment to the beneficiary of that order. *See* N.Y. U.C.C. § 4–A–104 (McKinney 1991).

### 1. Exclusivity of Article 4–A

Article 4–A grew out of the fact that "there was no comprehensive body of law—statutory or judicial—that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders." N.Y. U.C.C. Law § 4–A–102, Off. Com., at p. 559. As a consequence, in drafting Article 4–A, "a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." *Id.* The rulemakers also labored to write a detailed statute that would allocate risks among the various parties to such transactions in light of competing interests:

> These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article. N.Y. U.C.C. Law § 4–A–103, Off. Com., at p. 559

■ The Defendant relies heavily upon this language to support its claim that the New York legislature intended to replace the common law entirely with regard to wire transfers. This Court rejects that argument, adopting the rationale of *Sheerbonnet, Ltd. v. American Express Bank, Ltd.*, 905 F.Supp. 127 (S.D.N.Y.1995) (Preska, J.), decided after the parties had already submitted their briefs. The plaintiff in that case sued the defendant for making a wire transfer to an account that the defendant knew had just been frozen. The defendant sought dismissal, arguing that Article 4–A provided the exclusive remedy for the type of injury alleged. Faced with the same language from the statute's Official Comment that Amex now cites in this case, the Court ruled that the passages, on their face, "fail to establish a legislative intent to preclude any and all funds transfer actions not based on Article 4–A." *Id.* at 131. In noting that commentators uniformly recognize that Article 4–A is not a "hermetic legal seal" over funds transfers, the Court explained that "[a] desire to start on a 'clean slate' implies only that in drafting the Article, the legislature was neither borrowing from related U.C.C. regulations . . . nor from principles of common law or equity." *Id.* While Article 4–A should be the first place parties look for guidance when they seek to resolve claims arising out of a funds transfer, "the article has not completely eclipsed the applicability of common law in the area. The exclusivity of Article 4–A is deliberately restricted to 'any situation covered by particular provisions of the Article.' Conversely, situations not covered are not the exclusive province of the Article." *Id.* In fact, the Official Comment tacitly states that resorting to principles of law or equity outside of Article 4–A is acceptable, so long as it does not create rights, duties and liabilities "inconsistent with those stated in this Article." *Id.*

### 2. Coverage Under 4–A

The first question is whether or not the transactions at issue are even "payment orders" or "funds transfers" governed by Article 4–A.

The Plaintiff essentially brings claims based upon two separate transactions. First, Centre–Point argues that Amex improperly failed to debit its account and reinvest the

funds pursuant to rollover instructions. Second, the Plaintiff alleges that Amex paid funds on a fraudulent payment order in contravention of its security agreement and in disregard for known security risks. All of Centre–Point's claims are connected to these events.

■ There is legal significance attached to whether or not Amex's failure to follow the rollover instructions constitutes a wrongful act independent of its execution of the fraudulent payment order. The Court holds that the two incidents should be viewed separately. The extent to which the Plaintiff's claims are pre-empted by Article 4–A depends upon their relationship to activities which fall within 4–A's scope. For the reasons stated below, the Court holds that the rollover instructions are not "payment orders" and therefore are outside of Article 4–A. The fraudulent payment order, on the other hand, falls within Article 4–A. Thus, claims relating to the failure to debit are separate from the fraudulent payment order and are not precluded. Claims relating to the fraudulent payment order must be subjected to Article 4–A's next level of inquiry, namely, whether or not the Article contains a provision specifically relating to the wrong alleged.

Amex argues that the Court should view all the events in question as interdependent, since "it is disingenuous for Plaintiff to contend its claims are unrelated to the August 20 Payment Order." (Repl.Br. at p. 3.) The Defendant bases this assertion upon the fact that the relief sought, reimbursement of the $702,976.63, is based on the allegedly wrongful payment of the payment order. While it may be true that "but for" the Defendant's failure to properly debit the account, there would have been no money to subsequently pay out the fraudulent order, this fact alone does not establish that the events are an integrated transaction.

The Plaintiff telexed its initial rollover instructions on August 18, 1993. The Defendant received a fraudulent notice canceling these instructions the next day, August 19, 1993, at 4:58 P.M. Amex, apparently, had been prepared to debit Centre–Point's account, as per the original instructions, two minutes later, at 5:00 P.M., when it errone-

ously sent out a notice confirming compliance with the request. If it had been customary for Amex to delay compliance with the rollover instruction until 5:00 P.M., then one can directly link Amex' failure to debit Centre–Point's account to its receipt of the fraudulent cancellation notice. As the cancellation notice was fundamental to the subsequent fraud, a failure to debit the account, in such a case, would be dependent upon and interrelated with the subsequent fraud.

Given that this is a 12(b)(6) motion, however, the Court reads the Complaint generously, assessing whether Plaintiff could prove any set of facts upon which relief could be granted. In this case, as the Complaint does not indicate any course of dealings with regard to when Amex generally acted upon rollover instructions, the Plaintiff can argue that Amex should have debited the account *prior* to receiving the fraudulent cancellation notice. The wrongful conduct of failing to debit and reinvest, then, would be independent of the subsequent fraud. While there was no real injury until Amex paid the fraudulent payment order, the fact that both claims are based upon the same injury simply means that they allege different theories of the case. The claims based upon failure to debit cannot be dismissed simply because there are alternative claims, unless Article 4–A or some other legal principle requires dismissal. As discussed below, these claims do not even fall within the scope of Article 4–A, and thus cannot be preempted by the statute.

### i. Rollover Instructions

■ The rollover instructions do not constitute a "payment order" or "funds transfer" under the statute. A payment order requires an instruction to pay a fixed amount of money "to a beneficiary." N.Y. U.C.C. Law § 4–A–103(1)(a). A " 'beneficiary' means the person to be paid by the beneficiary's bank." N.Y. U.C.C. Law § 4–A–103(1)(b). In this case, Centre–Point's telex simply instructs Amex to debit its account and "invest same on a 90 day fixed deposit. Kindly advise us of the rate of investment." (Compl., Ex. 1.) The Plaintiff identifies no beneficiary, and in fact, grants Amex complete discretion to decide how the money should be invested. Amex could theoretically have transferred

the money into any of several different fixed deposit accounts.

This type of discretion is inconsistent with the administrative role Article 4–A contemplates for banks in covered transactions. "The function of banks in a funds transfer under Article 4A is comparable to the role of banks in the collection and payment of checks in that it is essentially mechanical in nature." N.Y. U.C.C. Law § 4–A–104, Off. Com., at p. 563. For the same reason, the Article requires that payment orders not state conditions to payment, so as to prevent banks from engaging in inquiries as to whether conditions have been satisfied. N.Y. U.C.C. Law § 4–A–103(1)(a)(i); see also 1B James J. White & Robert S. Summers, Uniform Commercial Code § 1–2, at 143 (3d ed. 1993). The legislature envisioned that the Article would cover wire transfers in which the "originator" instructs a bank to make payment into a specific account. See N.Y. U.C.C. Law § 4–A–104, Off.Com., at p. 562–63 (providing three hypothetical cases in which Article 4–A is applicable). While the originator and the beneficiary may even be the same person, for example when a corporation orders a bank to transfer money from one of its accounts to another, id., the Article does not contemplate coverage of the type of open-ended investment instruction at issue here.

Consequently, the Court finds that counts I and II of the Complaint, which relate exclusively to Amex' failure to follow rollover instructions, do not relate to funds transfers covered by Article 4–A. These claims are therefore not pre-empted by Article 4–A. To the extent that counts V, VI and VII relate to the failure to debit, they are also not precluded by Article 4–A.

### ii. Fraudulent Payment Orders

■ The Court concludes that the fraudulent payment orders fall squarely within Article 4–A. The inquiry, then, is whether the facts in dispute are "covered by particular provisions of the Article." N.Y. U.C.C. Law § 4–A–103, Off.Com., at p. 559. New York courts have precluded common law claims in cases where Article 4–A specifically addresses the subject matter involved. See Aleo Int'l, Ltd. v. Citibank, N.A., 160 Misc.2d 950,

612 N.Y.S.2d 540, 541 (Sup.Ct.N.Y.County 1994) (rejecting negligence claim resulting from failure to cancel payment order where two provisions specifically govern cancellation and amendment of payment orders, § 4–A–211(2), and acceptance of payment orders, § 4–A–209(2)); Southtrust Bank of Alabama, N.A. v. Turkiye Ithalat Ve Ihracat Bankasi, A.S., No. 116581/94 at pp. 7–8 (Sup.Ct.N.Y.County 1995) (dismissing negligence claim arising from a wire transfer to the wrong account number where § 4–A–207, misdescription of a beneficiary, controls); cf. Sheerbonnet, 905 F.Supp. at 133–34 (denying motion to dismiss common law claims where no language in Article 4–A prevents crediting of funds to frozen account).

As regards the payment of fraudulent payment orders, allegedly in breach of a duty to provide commercially reasonable security, §§ 4–A–201 to –204, dealing with security procedures and verification of payment orders, determine the rights, duties and obligations of the parties. Since there are specific Article 4–A provisions concerning these covered transactions, common law remedies are precluded in this area. Count IV and the portions of Counts V, VI and VII dealing with the payment of the fraudulent orders are dismissed.

### B. Validity of Negligence Count

■ Amex alternatively seeks dismissal of counts II and IV, arguing that they simply recast contractual claims as negligence counts. As discussed above, count IV is dismissed as preempted by Article 4–A. While Count II is not barred by Article 4–A, it is dismissed nonetheless.

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Clark–Fitzpatrick, Inc. v. Long Island R.R., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656–57, 516 N.E.2d 190, 193–94 (1987); see also Wexselblatt v. Bank of Boston Int'l, 666 F.Supp. 513, 517 (S.D.N.Y.1987) (quoting Luxonomy

*Cars, Inc. v. Citibank, N.A.,* 65 A.D.2d 549, 408 N.Y.S.2d 951, 954 (1978) (the exception occurs " 'only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated' ")). The duty which Centre–Point alleges that Amex breached in its negligence count, "to debit Centre–Point's account on August 18, 1993, and to reinvest the funds for 90 days", (compl. at ¶ 42), is identical to the contractual obligation which Amex allegedly breached. Count II is therefore dismissed.

### C. Breach of Duty of Good Faith and Fair Dealing

Defendant alternatively moves to dismiss count VII, alleging breach of duty of good faith and fair dealing. Amex contends that this count merely duplicates other claims. The Court agrees.

Although New York law implies a duty of good faith and fair dealing in every contract, a breach of that duty is merely a breach of the underlying contract. *Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991). The implied obligation is simply "in aid and furtherance of other terms of the agreement of the parties." *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983); *see also* N.Y. U.C.C. Law § 1–203 Official Comment (McKinney 1991) ("[t]he doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached"). Since Centre–Point has already brought a cognizable contract claim against Amex, count VII could not entitle Centre–Point to any relief to which it would not already be entitled. Consequently, the count is dismissed.

### Conclusion

Defendant's motion to dismiss is granted in part and denied in part. Counts II, IV and VII are dismissed in full. The portions of counts V and VI that deal with Amex' alleged security breach (¶¶ 64–66, 70–72) are also dismissed. The motion to dismiss is denied as to count I and remaining portions of counts V and VI (¶¶ 62–63, 67, 68–69, 73), and these claims survive.

SO ORDERED.