**BANCO DE LA PROVINCIA DE BUENOS AIRES, Plaintiff,**

v.

**BAYBANK BOSTON N.A., Defendant.**

**No. 95 CIV. 8165(RJW).**

United States District Court,
S.D. New York.

Oct. 31, 1997.

Michael E. Norton, King & Spalding, New York, NY, for Plaintiff.

John Calandra, McDermott, Will & Emery, New York, NY, for Defendant.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff Banco de la Provincia de Buenos Aires ("BPBA"), which filed this action seeking a declaratory judgment, now moves for summary judgment pursuant to Rule 56,

Fed.R.Civ.P. For the reasons that follow, plaintiff's motion is granted.

## BACKGROUND

BPBA is a bank incorporated under the laws of the Province of Buenos Aires, Republic of Argentina. Defendant BayBank Boston, N.A. ("BayBank") is a federally chartered national banking association with its principal place of business in Boston, Massachusetts.

On January 11, 1995, BPBA extended a loan of $250,000 ("the loan") to Banco Feigin S.A. ("Banco Feigin"), an Argentine bank that is not a party to this action. BPBA disbursed the proceeds of the loan to a credit account maintained by Banco Feigin at the New York City branch office of BPBA. The term of the loan, which was to mature on July 10, 1995, was 180 days.[1]

Between November 30, 1994 and March 14, 1995, Banco Feigin suffered a liquidity crisis, losing 49% of its deposits. In March 1995, the Central Bank of Argentina ("the Central Bank") commenced what is known under Argentine law as an Intervention ("the Intervention"), essentially an inquiry into the solvency of a bank. In the months that followed, the Central Bank issued a series of resolutions which suspended the operations of Banco Feigin and ultimately revoked Banco Feigin's authorization to operate as a bank under Argentine law.[2] The assets of Banco Feigin were liquidated and sold for the benefit of Banco Feigin's depositors at an auction sponsored by the Central Bank in July 1995.

In light of the Central Bank's suspension of Banco Feigin's operations on March 17, 1995, BPBA placed an administrative freeze on Banco Feigin's credit balance account on March 22, 1995. Aff. of William R. Molloy Supp. Summ. J. ("Molloy Aff.") ¶ 8. On that date, Banco Feigin's BPBA account contained $245,529.55, and consisted solely of proceeds from BPBA's January 1995 loan to Banco Feigin.

According to BPBA, pursuant to the provisions of N.Y. Debtor and Creditor Law § 151, the Intervention by the Central Bank that began on March 17, 1995 gave BPBA the right, at any time after the Intervention, to a set-off against the money owed to BPBA by Banco Feigin. On April 19, 1995, BPBA exercised this statutory right of set-off by applying against the indebtedness of Banco Feigin to BPBA the funds contained in Banco Feigin's account. The amount of the set-off was $245,529.55, the remainder of Banco Feigin's BPBA account. BPBA notified Banco Feigin of the set-off by telex dated April 19, 1995. Banco Feigin's remaining indebt-

---

1. No formal promissory note was executed by Banco Feigin since the loan constituted a bank-to-bank transaction.

2. In response to the liquidity crisis, the Chairman of Banco Feigin's Board of Directors asked the Central Bank of Argentina on March 17, 1995 to suspend the operations of the bank for sixty days so that it might resolve the situation. That same day, the Central Bank issued Resolution No. 58, which ordered the total suspension of operations of Banco Feigin for thirty days and required the bank to submit a normalization and reorganization plan within fifteen days which set out "the measures that are needed in order to restore the entity's operable viability and liquidity."

The bank failed to comply with the requirements of Resolution No. 58. Accordingly, on April 18, 1995, the Central Bank issued Resolution No. 112, which extended the suspension of Banco Feigin's operations for fifteen days and ordered the bank to immediately comply with the provisions of Resolution No. 58. On May 3, 1995, Banco Feigin submitted a reorganization plan. The plan, however, did not comport with the Central Bank's Resolutions. In Resolution No. 144, dated May 3, 1995, the Central Bank noted that Banco Feigin had failed to submit an assets statement certified by its external auditors and had not responded to requests for information that were made by those appointed to oversee the reorganization. The Central Bank again extended the suspension of operations for fifteen days, to allow Banco Feigin to reformulate the plan it had submitted.

Banco Feigin ultimately withdrew the plan, and proposed to sell off its branches in a bidding process. By Resolution No. 200, dated May 18, 1995 the suspension of the bank's operations was extended for thirty days so that it might "expand upon and give details about the proposal." In Resolution No. 334, dated June 14, 1995, the Central Bank authorized "the restructuring of Banco Feigin S.A. for the protection of its depositors." The resolution also provided for the sale of Banco Feigin's assets by means of a bidding process. Finally, in Resolution No. 421, dated July 18, 1995, the Central Bank revoked Banco Feigin's authorization to operate as a bank.

edness to BPBA as a result of the January 1995 loan was $12,637.12.

After the Central Bank began its Intervention, but before the April 19, 1995 set-off, Banco Feigin's Buenos Aires branch sent BPBA a request to transfer $245,000 from Banco Feigin's account with BPBA in New York to a Banco Feigin account at BayBank in Boston (the "wire transfer request"). According to BayBank, Banco Feigin intended to use the transferred funds to repay amounts it owed to BayBank. BPBA received the wire transfer request on March 24, 1995, but did not accept the payment order or transfer the funds because of the administrative freeze on Banco Feigin's account and BPBA's then existing but as yet unexercised right of set-off.

In a letter to BPBA dated August 4, 1995, BayBank demanded that BPBA pay it $245,000, plus interest, representing the monies not sent on March 24, 1995 to Banco Feigin's BayBank account. In its letter, BayBank stated its intent to initiate legal proceedings if the demand was not met in full by August 31, 1995.

BPBA commenced this action against BayBank in the Supreme Court of the State of New York, County of New York, on September 1, 1995. The case was subsequently removed to this Court based upon the parties' diversity of citizenship under 28 U.S.C. §§ 1332(a)(2) and 1348, and under 12 U.S.C. § 632, since the defendant is a banking corporation organized under the laws of the United States and the lawsuit involves international banking transactions.

In its complaint, plaintiff seeks a declaratory judgment that on April 19, 1995, BPBA had the right to set-off against the funds in Banco Feigin's account at BPBA, and that this right to set-off was superior to any right BayBank may have had as the bank maintaining an account of Banco Feigin to which Banco Feigin had requested its funds be sent. BayBank counterclaims in the amount of $245,000 plus interest, alleging BPBA wrongfully converted its money when it refused to execute the wire transfer request. Claiming that the $245,000 became its property upon BPBA's receipt of Banco Feigin's wire transfer request, BayBank seeks a declaratory judgment that the set-off exercised by BPBA was unlawful and that BayBank's right to the funds which were the subject of the wire transfer request of Banco Feigin was superior to BPBA's right to such funds.

## DISCUSSION

### I. The Standard for Summary Judgment

Summary judgment is appropriate where the moving party has established that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. On a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). In making this determination, the Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden under Rule 56, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. The non-moving party is required to introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

### II. N.Y. U.C.C. Article 4–A

Disputes arising from wire transfers are now governed by Article 4A of the Uniform Commercial Code. Article 4A was enacted in the wake of technological advances allowing the electronic transfer of funds, a means by which up to a trillion dollars is shifted daily.

*Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 951 F.Supp. 403, 407 n. 1 (S.D.N.Y.1995). At the time Article 4A was drafted, "there was no comprehensive body of law—statutory or judicial—that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders." N.Y. U.C.C. § 4–A–102, Official Comment, p. 559. The statute reflects "[a] deliberate decision ... to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles." *Id.*

The electronic transfer of funds is accomplished through the use of one or more payment orders. A payment order is sent by the "sender" to the "receiving bank," for ultimate payment to the "beneficiary" or the "beneficiary's bank." In the instant case, Banco Feigin is both the sender and the beneficiary, BPBA is the receiving bank, and BayBank is the beneficiary's bank. The first step in a funds transfer is the sender's transmission of a payment order to a receiving bank. Before the transfer proceeds, the receiving bank must accept the sender's payment order.

### A. BPBA properly rejected the payment order under N.Y. U.C.C. § 4–A–209(1)

Under § 4–A–209(1), "a receiving bank other than the beneficiary's bank accepts a payment order when it executes the order." This provision has been interpreted to give receiving banks other than the beneficiary's bank general discretion in choosing whether to accept or reject payment orders. *Sheerbonnet,* 951 F.Supp. at 413. BPBA contends that its refusal to execute the payment order constituted a rejection of the payment order that was within its discretion.

**3.** BayBank also argues that "the critical issue in this litigation ... is whether BPBA acted in bad faith in failing to accept the payment order." Def.'s Mem. Opp. Summ. J. at 3. There is no support, however, for the imposition of such a good faith obligation. BayBank cites *dicta* in *Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* discussed more fully *infra,* for the proposition that a bank acts in bad faith by retaining a debtor's funds to use as a set-off. In *Sheerbon-*

According to BayBank, BPBA does not have absolute discretion in deciding whether to accept or reject payment orders.[3] BayBank contends that

[i]t can hardly promote the purposes of Article 4–A to equate a general discretion to accept or reject payment orders with a ban on judicial inquiry into the circumstances under which that discretion was exercised and what followed its exercise.

*Sheerbonnet,* 951 F.Supp. at 411. This Court agrees that receiving banks' exercise of discretion in accepting or rejecting payment orders should not be above judicial scrutiny.

In examining the circumstances under which BPBA rejected the payment order, however, it becomes clear that BPBA's rejection was neither an abuse of discretion nor in bad faith. At the time BPBA rejected the payment order, Banco Feigin's BPBA account—which consisted solely of proceeds of BPBA's January 1995 loan to Banco Feigin—was under an administrative freeze, and Banco Feigin's banking activities had been suspended as part of an Intervention by the Central Bank of Argentina. As discussed in Section III *infra,* BPBA knew that the Intervention gave it an immediate right of set-off under N.Y. Debt. and Cred. Law § 151. Moreover, Banco Feigin's debt to BPBA exceeded the balance in the account. Under those circumstances, it was not unreasonable for BPBA to refuse to wire the entire balance of the account to Banco Feigin's BayBank account. Therefore, BPBA's rejection of the payment order was a proper exercise of its discretion under § 4–A–209.

### B. Since BPBA properly rejected the payment order, it incurred no duty to Banco Feigin or BayBank

Liability of receiving banks arises only if the receiving bank accepts a payment

*net,* however, the district court merely denied a motion to dismiss, holding that Article 4A was not exclusive, and that the plaintiff in that case had stated a *prima facie* claim for conversion. The court did not hold that AEB had acted in bad faith, but merely observed that AEB had at least been in a position to unfairly capitalize on the seizure of one of the intermediary banks in that funds transfer. *Sheerbonnet,* 951 F.Supp. at 413.

order, or if there is an express agreement between the sender and the receiving bank which requires the receiving bank to execute payment orders. Section 4–A–212, entitled, "Liability and Duty of Receiving Bank Regarding Unaccepted Payment Order," provides:

> If a receiving bank fails to accept a payment order that it is obliged by express agreement to accept, the bank is liable for breach of the agreement to the extent provided in the agreement or in this Article, but does not otherwise have any duty to accept a payment order.... Liability based on acceptance arises only when acceptance occurs as stated in Section 4–A–209.

BPBA incurred no liability since there was no acceptance under § 4–A–209 and there was no agreement between BPBA and Banco Feigin requiring BPBA to accept the payment order. Molloy Aff. ¶ 12.

### III. BPBA's set-off was lawful under N.Y. Debtor and Creditor Law § 151

N.Y. Debtor and Creditor Law § 151(a) gives creditors an immediate right to set-off the indebtedness of a debtor, upon "the commencement of any proceeding under any foreign bankruptcy, insolvency, debtor relief or other similar statute or body of law, by or against a [debtor]." The Intervention of Banco Feigin by the Central Bank of Argentina, and the resulting liquidation and sale of Banco Feigin's assets, qualifies as a proceeding similar to one for debtor relief or insolvency under § 151.

According to BayBank, no right of set-off was triggered under § 151. First, BayBank argues that there was no Intervention, since Banco Feigin voluntarily suspended its oper-

ations on March 17, 1995. *See* note 2, *supra.* That Banco Feigin asked the Central Bank to suspend its operations does not persuade the Court that there was no Intervention or that the Central Bank would not have intervened absent Banco Feigin's request. The several resolutions issued by the Central Bank, *id.*, make clear that Banco Feigin was insolvent at the time of the set-off.

Second, BayBank contends that an Intervention does not constitute an insolvency proceeding for purposes of N.Y. Debt. & Cred. L. § 151. This defies reason. Once Banco Feigin had lost 49% of its deposits, the Central Bank intervened, first suspending Banco Feigin's operations, then revoking its authorization to operate as a bank under Argentine law, and finally, liquidating and selling its assets at auction.

Finally, BayBank argues that BPBA's set-off was improper, since under New York law, "when a bank is on notice that funds in a depositor's account are owned by a third party, the bank cannot appropriate those funds in order to set them off against a debt of the depositor."[4] *Daly v. Atlantic Bank of New York*, 201 A.D.2d 128, 129, 614 N.Y.S.2d 418, 419 (1st Dep't 1994). As explained more fully in Section IV *infra*, however, BayBank has failed to establish that it owned the funds in question. Nor has it shown that BPBA was aware of any claim it may have had.

### IV. BayBank's Conversion Claim

For a conversion claim arising from a funds transfer to stand, it must not be inconsistent with Article 4A, which is

---

**4.** This rule is based on the difference between "general" and "special" deposits. Funds in general accounts are considered the property of the bank, while funds in special accounts remain the property of the depositor. *Swan Brewery Co. Ltd. v. United States Trust Co.*, 832 F.Supp. 714, 717 (S.D.N.Y.1993). The distinction is important because while a "depository institution may apply the funds in a general account to set off debts owed to it by a depositor[,][i]t may not do so with funds in a special account." *Id.* at 718. Under New York law,

> [i]n the absence of an agreement and proof to the contrary, a deposit is presumed to be gen-

eral rather than special, and the burden devolves on the party who claims that the deposit is a special one to show that it was received by the bank with the express or clearly implied agreement that it should be kept separate from the general funds of the bank and that it should remain intact.

*Fenton v. Ives*, 222 A.D.2d 776, 778, 634 N.Y.S.2d 833, 834 (3d Dep't 1995) (citation omitted). BayBank does not allege that Banco Feigin's BPBA account was special, nor that the subject transaction involved any special agreement.

intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

N.Y. U.C.C. Law § 4–A–102, Off. Cmt. at 559. Plaintiff interprets the foregoing commentary as precluding an action for conversion arising from a funds transfer. This court adheres to the principle that Article 4A does not preclude common law claims. *Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 951 F.Supp. 403, 409 (S.D.N.Y.); *Centre–Point Merchant Bank Ltd. v. American Express Bank, Ltd.,* 913 F.Supp. 202, 206 (S.D.N.Y.1996). The question remains, however, whether defendant's conversion claim is inconsistent with Article 4A.

■ Under New York law, conversion is any act of dominion wrongfully exerted over the personal property of another inconsistent with that person's rights in the property. *Cumis Ins. Soc'y, Inc. v. Citibank, N.A.,* 921 F.Supp. 1100, 1110 (S.D.N.Y.1996) (citation omitted). To support its conversion claim, BayBank relies heavily on *Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 951 F.Supp. 403 (S.D.N.Y.1995). BayBank interprets *Sheerbonnet* as imposing a good faith requirement on receiving banks, and argues that, like in *Sheerbonnet,* there is a question of whether BPBA, as the receiving bank, acted in bad faith by applying the subject funds as a set-off. Concededly, there are some parallels between *Sheerbonnet* and the case at bar. The instant case, however, does not fit neatly into any of the rules established by *Sheerbonnet.*

The transfer of funds in *Sheerbonnet* involved several intermediary banks, including the defendant in that case, American Express Bank, Ltd. ("AEB") and Bank of Credit and Commerce, S.A. ("BCCI"). Plaintiff Sheerbonnet was to be the beneficiary of the funds transfer, a seller awaiting the payment of goods.

Midway through the funds transfer, on July 5, 1991, the Federal Reserve advised AEB and other banks of the suspension of BCCI's accounts worldwide. Also on July 5, the Superintendent of Banks of the State of New York closed BCCI's New York agency and announced the seizure of all "business and property" of BCCI in New York. On the same day, AEB received instructions from sender's correspondent bank to credit BCCI's AEB account for $12.4 million. Once the money was credited to BCCI, BCCI was to transfer it to Sheerbonnet.

Despite the suspension of BCCI's accounts and the seizure of its business and property in New York, and knowing BCCI's AEB account was frozen, AEB went ahead and credited BCCI's account for the $12.4 million. "After crediting the funds to the BCCI account, AEB asserted its rights over virtually the entire account as an off-set against debts owed to it by the insolvent BCCI." *Sheerbonnet,* 951 F.Supp. at 405. "Thus, the money originally destined for Sheerbonnet ended up not in the hands of the buyer or the seller, but of a bank whose only role was to transfer the funds." *Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 17 F.3d 46, 48 (2d Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994).

Sheerbonnet sued AEB for conversion, tortious interference with contract and unjust enrichment, arguing that

in light of the unprecedented and superseding seizure of BCCI, AEB's decision to credit the BCCI London account, knowing that it was frozen and knowing that AEB would use these very funds as a $12.4 million set-off against BCCI's debt to AEB, was an exercise in self-serving, tortious tunnel vision.

*Sheerbonnet,* 951 F.Supp. at 413. According to Sheerbonnet, AEB had " 'made a conscious decision to turn its knowledge and position [in the transfer transaction] to its own advantage,' because [AEB] knew that under New York law it would be able to retain the funds as a setoff against BCCI's debts to [AEB]." *Sheerbonnet,* 17 F.3d at 48.

AEB moved to dismiss the complaint, contending that Sheerbonnet's common law tort claims were inconsistent with Article 4A, which, it argued, exclusively governs disputes

arising from funds transfers. The court denied the motion, concluding that Article 4A was not exclusive, and that plaintiff "made a prima facie claim" for conversion. *Sheerbonnet*, 951 F.Supp. at 414.

The case at bar, however, is unlike *Sheerbonnet* in several important respects. In *Sheerbonnet*, AEB—having notice that BCCI was insolvent—credited BCCI's account with money from a third party, solely to use the funds as a set-off of amounts owed AEB by BCCI. Here, Banco Feigin's BPBA account was under an administrative freeze and consisted solely of money BPBA had loaned Banco Feigin. BPBA simply reclaimed, as a set-off, money it had loaned Banco Feigin not two months earlier. Neither the administrative freeze on the account, nor the set-off, were applied in bad faith. BayBank's contention that it somehow had a superior right to these funds is unpersuasive.

BayBank's conversion claim fails for several reasons. First, there is no support for BayBank's contention that the $245,000 that was the subject of the wire transfer request became the property of BayBank upon BPBA's receipt of the wire transfer request. Answer to Am. Compl. and Countercl. at ¶ 23. To prevail on its claim for conversion, BayBank must prove that it had "an ownership interest or an 'immediate superior right of possession to property.'" *Lind v. Vanguard Offset Printers, Inc.*, 857 F.Supp. 1060, 1066 (S.D.N.Y.1994). BayBank has failed to do so, and thus has not established ownership, an essential element of conversion.

Second, there was no intent on the part of BPBA to ever deprive BayBank of the property. According to the wire transfer request, BPBA was to transfer the money to the account of Banco Feigin, not to BayBank. Banco Feigin was the beneficiary. BayBank was merely the beneficiary's bank. Finally, the question remains whether BayBank's conversion claim survives in light of the Court's determination that BPBA properly rejected the payment order and applied the funds in Banco Feigin's account as a set-off under N.Y. U.C.C. § 4–A–209 and N.Y. Debt. and Cred. Law § 151, respectively. In *Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*, 921 F.Supp. 1100 (S.D.N.Y.1996), the court dismissed such a claim, noting that "all of the acts alleged to constitute a conversion were specifically authorized under applicable provisions of the U.C.C. and were not wrongful, improper, or in contravention of [subrogor's] rights." *Cumis*, 921 F.Supp. at 1110. The same is true here.

While *Sheerbonnet* is instructive, it is distinguishable. The *Sheerbonnet* court held that plaintiff stated a *prima facie* claim for conversion. The ultimate question of whether the receiving bank had indeed acted in bad faith, and whether that bad faith rose to the level of conversion, was never decided. The motion before this court is one for summary judgment. This Court agrees that a conversion claim is not necessarily inconsistent with Article 4A. Since all of the actions taken by plaintiff were proper under Article 4A and N.Y. Debt. and Cred. L. § 151, however, this particular conversion claim is inconsistent with those provisions. Moreover, defendant has neither shown that plaintiff acted in bad faith nor satisfied the elements of conversion.

Finally, the Court notes that it has found no precedent allowing the intended beneficiary of a funds transfer to recover from a receiving bank. Any claim BayBank has is against Banco Feigin, not BPBA.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendant's counterclaim is dismissed. The Court declares that on April 19, 1995, BPBA had the right to a set-off against the funds in Banco Feigin's account at BPBA, and that this right to a set-off was superior to any right BayBank may have had as the bank maintaining an account of Banco Feigin to which Banco Feigin had requested its funds be sent.

It is so ordered.