Present: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Lemons, JJ., and Compton,* S.J.

KURT G. SCHLEGEL

v. Record No. 051651  OPINION BY JUSTICE CYNTHIA D. KINSER
                                      April 21, 2006
BANK OF AMERICA, N.A., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Edward L. Hogshire, Judge

This appeal involves a funds transfer made pursuant to alleged unauthorized payment orders and the receiving bank's subsequent freezing of the transferred funds without refunding them to the customer's account. The primary issue concerns whether Code § 8.4A-204(a) preempted certain common law claims asserted as a result of the unauthorized payment orders and the freezing of the funds. Because the unauthorized payment orders are covered by Code § 8.4A-204(a), the common law claims pertaining to that transaction are preempted. Proceeding on the common law claims relating to the subsequent freezing of the funds, however, would not create rights, duties, and liabilities inconsistent with the provisions of Title 8.4A. Thus, those claims are not preempted. We will therefore affirm

---

*  Senior Justice Compton participated in the hearing and decision of this case before his death on April 9, 2006.

in part and reverse in part the judgment of the circuit court.

I. RELEVANT FACTS AND PROCEEDINGS

The funds at issue in this appeal were transferred from a corporate bank account in the name of Piedmont Building & Development Corporation (Piedmont).  The appellant, Kurt G. Schlegel, and his uncle, Christopher C. Grieb, were the corporation's only shareholders, with each owning 50 percent of the company's stock.  In 1999, Schlegel, in his capacity as president and acting secretary of Piedmont, opened a corporate checking account with a bank that is apparently a predecessor in interest to the appellee, Bank of America, N.A., (the Bank).  The corporate signature card listed only Schlegel as having authority to access the Piedmont account.  The corporate resolution authorizing the opening of the account, however, listed both the president and chief executive officer as the corporate officials having the power to act on behalf of Piedmont with respect to the bank account.

Less than a year earlier, in a corporate resolution authorizing the opening of a different account for Piedmont at the Bank, Grieb was listed as chairman of Piedmont and was one of the persons authorized to access that particular bank account.  Schlegel admitted that he never notified the

Bank that the authority granted to Greib pursuant to the earlier corporate resolution had been revoked.

At some point, Schlegel and Grieb disagreed about the control and ownership of Piedmont. Schlegel sold property owned by Piedmont and deposited the sale proceeds into the Piedmont bank account at issue in this appeal. In November 2001, after Grieb learned of the transaction, he contacted the Bank, in his capacity as chairman and chief executive officer of Piedmont, and initiated two payment orders against Piedmont's bank account. Grieb instructed the Bank to transfer all funds in excess of $5,000 from Piedmont's account to his personal account at the Bank. Pursuant to those payment orders, the Bank transferred $65,655.48 from Piedmont's bank account to Grieb's personal bank account.

After the transfer of Piedmont's funds, Schlegel notified the Bank orally and in writing that the payment orders were unauthorized because Grieb was no longer affiliated with Piedmont and had no authority to send the payment orders. On November 19, 2001, in response to Schlegel's complaint, the Bank placed a "hard hold" on the funds it had transferred to Grieb's account, with neither Schlegel nor Grieb allowed access to the funds. The funds, however, remained in Grieb's bank account.

3

In February 2002, Grieb filed a suit against Schlegel to dissolve Piedmont.  Schlegel and Grieb eventually settled the suit by agreeing, among other things, that each would receive 50 percent of the funds frozen by the Bank. The Bank then offered to distribute the frozen funds according to the settlement between Schlegel and Grieb, provided the Bank could recover a portion of its attorney's fees and be dismissed from further liability.  An agreement was not reached on the Bank's request.

Instead, Schlegel pursued the suit he had filed against the Bank in December 2002, seeking damages for conversion, breach of contract, and violation of Code § 8.4A-204 for the unauthorized payment orders.[1]  Schlegel alleged that the Bank not only transferred funds from Piedmont's corporate bank account without authority to do so, but also wrongfully froze the funds, thereby depriving Piedmont of the use of its property.  In response, the Bank filed an answer, a cross-bill for interpleader of the frozen funds, and a third-party cross-bill against Grieb

---

[1] Schlegel alleged that Piedmont had assigned its cause of action against the Bank to him and he was therefore bringing the suit in his own name.
    Schlegel filed a motion for leave to file an amended bill of complaint.  Although the Bank had no objection to Schlegel's motion, the circuit court never entered an order granting the motion.

4

for indemnification and/or contribution. Grieb denied any liability to the Bank.

The Bank subsequently filed a motion for summary judgment with regard to Schlegel's suit and its cross-bill for interpleader. The Bank argued that Code § 8.4A-204 preempted Schlegel's common law claims and provided the exclusive remedy for the alleged unauthorized payment orders. The Bank asked the circuit court to order that the frozen funds be distributed between Schlegel and Grieb and to permit it to recover its attorney's fees from the funds before distribution. Schlegel filed a cross-motion for summary judgment with regard to the Bank's cross-bill for interpleader, asking that the Bank be required to return the funds transferred from Piedmont's bank account and pay attorney's fees and costs. Schlegel also requested that a trial date be set for his claims against the Bank for conversion and breach of contract.[2]

In a letter opinion, the circuit court identified two issues based on the cross-motions for summary judgment: (1) whether Code § 8.4A-204 preempted Schlegel's common law claims for conversion and breach of contract; and (2)

[2] Grieb also filed a motion for summary judgment, stating that the Bank's claim against him should be dismissed if summary judgment were granted in favor of the Bank.

whether the Bank was entitled to an award of attorney's fees under its cross-bill for interpleader.  As to the first issue, the circuit court concluded that Schlegel's allegations fell "squarely within the confines" of Code § 8.4A-204 and that his common law claims were, therefore, preempted by that statute.  On the second issue, the circuit court, exercising its discretion to award attorney's fees and costs in an interpleader action when the plaintiff has acted in good faith, see Pettus v. Hendricks, 113 Va. 326, 332, 74 S.E. 191, 194 (1912), decided that the Bank should be awarded reasonable attorney's fees and costs.  Thus, the court granted the Bank's motion for summary judgment and denied both Schlegel's and Grieb's motions for summary judgment.

After receiving evidence on the issue of attorney's fees, the circuit court, in a separate letter opinion, directed that the interpleaded funds be divided equally between Schlegel and Grieb.  The court, however, awarded 20 percent of the interpleaded funds to the Bank as its attorney's fees.  The court found that the Bank had filed its cross-bill for interpleader a month after Schlegel and Grieb settled the suit between them but that resolution of the interpleader was delayed because Schlegel pursued his claims for breach of contract and conversion.  In the

6

court's view, the Bank had been required to expend an "extraordinary amount of time and money in defending and prosecuting the interpleader." Thus, the court directed that the Bank collect 95 percent of its award for attorney's fees from Schlegel's share and 5 percent from Grieb's share. Schlegel now appeals the circuit court's judgment.

## II. ANALYSIS

On appeal, Schlegel challenges the circuit court's conclusion that Code § 8.4A-204 preempted his common law claims and the award of attorney's fees. The circuit court decided the preemption issue on cross-motions for summary judgment. When no material facts are genuinely in dispute, summary judgment is appropriate. Former Rule 3:18 (now Rule 3:20); Thurmond v. Prince William Prof'l Baseball Club, Inc., 265 Va. 59, 64, 574 S.E.2d 246, 250 (2003). Since the circuit court's ruling on that issue was predicated entirely on a question of law, this Court will review the decision de novo. See Sheets v. Castle, 263 Va. 407, 410, 559 S.E.2d 616, 618 (2002).

On the other hand, the award of attorney's fees to the Bank rested within the sound discretion of the circuit court. See Coady v. Strategic Resources, Inc., 258 Va. 12, 18, 515 S.E.2d 273, 276 (1999). On appeal, we will set

7

aside the circuit court's determination on that issue only if the court abused its discretion.  See Holmes v. LG Marion Corp., 258 Va. 473, 479, 521 S.E.2d 528, 533 (1999).

### A. Code § 8.4A-204 and Preemption

The question whether the provisions of Code § 8.4A-204 preempted Schlegel's common law claims for conversion and breach of contract is one of first impression in Virginia. Title 8.4A, which is essentially identical to Article 4A of the Uniform Commercial Code, governs a particular method of payment generally referred to as a funds transfer.  Code § 8.4A-102 cmt.; see also Fitts v. AmSouth Bank, 917 So.2d 818, 822 (Ala. 2005).  The term

> "[f]unds transfer" means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order.  The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order.  A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

Code § 8.4A-104(a).  In pertinent part, the term "[p]ayment order" is defined as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary."  Code § 8.4A-103(a)(1).

8

In the funds transfer at issue in this appeal, Grieb's instruction to the Bank to transfer money out of Piedmont's account to his personal account was a "payment order." See Code § 8.4A-104 cmt. 1. Grieb was the "sender" of the payment order, and the Bank was the "receiving bank." See id.; Code §§ 8.4A-103(a)(4) and (5) (defining the terms "receiving bank" and "sender"). Grieb, in his individual capacity, was the "beneficiary" of the payment order, and the Bank was the "beneficiary's bank." See Code § 8.4A-104 cmt. 1; Code §§ 8.4A-103(a)(2) and (3) (defining the terms "beneficiary" and "beneficiary's bank"). In this funds transfer, there was no "[i]ntermediary bank." See Code § 8.4A-104(b).

The statute forming the basis of the circuit court's decision, Code § 8.4A-204(a), provides:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under § 8.4A-202, or (ii) not enforceable, in whole or in part, against the customer under § 8.4A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund. However, the customer is not entitled to interest from the bank on the amount to be refunded if the customer fails to exercise ordinary care to determine that the order was not authorized by the customer and to notify the bank of the relevant facts within a reasonable time

9

not exceeding 90 days after the date the customer received notification from the bank that the order was accepted or that the customer's account was debited with respect to the order. The bank is not entitled to any recovery from the customer on account of a failure by the customer to give notification as stated in this section.

This statutory provision provides a customer, such as Piedmont (and now Schlegel, through assignment of Piedmont's claim), with a remedy for acceptance of an unauthorized payment order. The remedy is a refund of the amount wrongfully transferred plus interest if the customer exercised ordinary care to determine that the payment order was unauthorized and so notified the receiving bank within a reasonable time. Id. The question, however, is whether that is the only remedy for acceptance of an unauthorized payment order. The Bank argues that it is the sole remedy because Code § 8.4A-204(a) expressly addresses a customer's rights in the event of an unauthorized payment order and thereby preempts any common law remedy.

Even though the circuit court concluded that the provisions of Code § 8.4A-204(a) preempted Schlegel's common law claims for conversion and breach of contract, the court nevertheless recognized that some courts have allowed common law claims to proceed when the claims fell outside the particular situation covered by Code § 8.4A-204(a). We agree that certain common law claims may not be

10

preempted by Title 8.4A, but we disagree with a portion of the circuit court's decision in this case.

In Centre-Point Merchant Bank Ltd. v. American Express Bank Ltd., 913 F.Supp. 202, 204 (S.D.N.Y. 1996), the court addressed two separate claims, one being that American Express had failed to debit Centre-Point's account and reinvest the funds as instructed by a "telex" communication and the other claim being that American Express had transferred funds from Centre-Point's account pursuant to a fraudulent payment order. With regard to the first claim, the court held that the "rollover" instructions were not "payment orders" within the meaning of Article 4A of New York's Uniform Commercial Code. Id. at 207. As to the second claim, the court found that the fraudulent payment order did fall within the scope of Article 4A. Id.

The next question for the court was whether Article 4A provided the exclusive remedy for the injury caused by the fraudulent payment order. Id. at 208. The court concluded that the claim involved an alleged breach of a duty to provide commercially reasonable security procedures to verify payment orders. Id. Therefore, the claim concerned a transaction covered by Article 4A and would determine the rights, duties, and obligations of the parties to the transaction. Id. Thus, the court decided that the claim

11

for the fraudulent payment order was precluded by Article 4A.  Id.; see also Fitts, 917 So.2d at 825 (common law claims for breach of contract, negligence, suppression, wantonness, and conspiracy were all based on an improper funds transfer and were thus preempted by Article 4A).

Explaining its decision, the court quoted extensively from the holding in Sheerbonnet, Ltd. v. American Express Bank, Ltd., 951 F.Supp. 403 (S.D.N.Y. 1995):

> While Article 4-A should be the first place parties look for guidance when they seek to resolve claims arising out of a funds transfer, "the article has not completely eclipsed the applicability of common law in the area.  The exclusivity of Article 4-A is deliberately restricted to 'any situation covered by particular provisions of the Article.'  Conversely, situations not covered are not the exclusive province of the Article."  In fact, the Official Comment tacitly states that resorting to principles of law or equity outside of Article 4-A is acceptable, so long as it does not create rights, duties and liabilities "inconsistent with those stated in this Article."

Centre-Point, 913 F.Supp. at 206 (quoting Sheerbonnet, 905 F.Supp. at 407-08).

In contrast, the court in Hedged Investment Partners, L.P. v. Norwest Bank Minnesota, N.A., 578 N.W.2d 765, 771 (Minn. Ct. App. 1998), held that certain claims arising from unauthorized funds transfers were not preempted by Article 4A of Minnesota's Uniform Commercial Code.  At issue were 26 funds transfers that allegedly were not authorized under an Agency Agreement between a limited

12

partnership and a bank. Id. at 769. The court concluded

that the contractual responsibilities at issue were not

excluded by Article 4A because the Agency Agreement

addressed fiduciary responsibilities that went beyond the

scope of funds transfers. The court stated that

> the exclusivity of Article 4A is restricted to
> situations that are covered by particular
> provisions of the Article and that principles of
> law and equity may be applied to disputes
> relating to funds transfers so long as those
> principles do not create rights, duties, or
> liabilities inconsistent with those stated in the
> Article.

Id. at 771.

In the case before us, Schlegel's common law claims

against the Bank involved two separate transactions. The

first one was the alleged unauthorized payment orders Greib

sent to the Bank. The provisions of Code § 8.4A-204(a)

address a receiving bank's liability if it accepts a

payment order that is not authorized and not effective as

the order of the customer. The alleged unauthorized

payment orders are a "situation covered by the particular

provisions" of Code § 8.4A-204(a) and the remedy Schlegel

seeks in his common law claims would conflict with the

statutory remedy. Code § 8.4A-102 cmt.; see Sheerbonnet,

951 F.Supp. at 408, 410. In other words, to allow Schlegel

to proceed on his common law claims with regard to the

13

unauthorized payment orders would "create rights, duties and liabilities inconsistent with those stated in" Code § 8.4A-204(a). Code § 8.4A-102 cmt.; see also Centre-Point, 913 F.Supp. at 206; Fitts, 917 So.2d at 824. Therefore, his common law claims as they relate to the alleged unauthorized payment orders are preempted by the provisions of Code § 8.4A-204(a).

We do not, however, reach the same conclusion with regard to Schlegel's common law claims arising from the second transaction, i.e. the freezing of the funds without refunding them to Piedmont's bank account. Schlegel asserted that the Bank wrongfully exercised dominion and control over Piedmont's funds when the Bank froze the funds instead of returning them after learning that the payment orders were not authorized. According to Schlegel, that dominion and control over the funds continued when the Bank refused to disburse the frozen funds after Schlegel and Grieb resolved their differences about ownership of Piedmont and the transferred funds.

The Bank nevertheless contends that, pursuant to its deposit agreement with Piedmont, it had the authority to freeze the funds at issue because of the dispute between Schlegel and Grieb. Regardless of whether the Bank is correct, no provision of Title 8.4A covers the second,

14

independent transaction by the Bank and Schlegel's common law claims for conversion and breach of contract arising from that transaction.  We agree with the observations of the court in Sheerbonnet:

> The rules of [Article 4A] are transactional, aimed essentially at resolving conflicts created by erroneous instruction or execution of payment orders, whether by the originator, by an intermediary or receiving bank, or by the beneficiary's bank.  A major objective is to reduce and control risks that arise in payment systems by defining when and how rights and obligations are incurred and discharged.  As organized by the article, funds transfer errors fall into three main categories.  Errors may occur during the issuance and acceptance of the payment order [as when the Bank in the instant case accepted Grieb's alleged unauthorized payment orders], or [when the payment order] identifies the wrong beneficiary or . . . is untimely cancelled.  Errors may also occur during the execution of the payment order by the receiving bank –– as when the originator's instructions are not followed, or the order is executed late, or is issued in an improper amount, or is not executed at all.  Errors may also stem from payment issues – as in the obligation of the originator to pay the receiving bank, of the beneficiary's bank to pay the beneficiary, and notification of payment and discharge of duties requirements.

951 F.Supp. at 412.

Schlegel's common law claims as to the second transaction by the Bank do not fall within these categories of error.  In other words, the freezing of the funds in Grieb's account instead of returning the funds to Piedmont's account is not a situation covered by any of the particular provisions of Title 8.4A.  See Code § 8.4A-102

15

cmt.  Thus, contrary to the circuit court's finding, we conclude that Schlegel's common law claims in this regard do not "fall squarely within the confines" of Code § 8.4A-204 or any other provision of Title 8.4A.  These specific common law claims are not preempted, and the circuit court erred in finding otherwise.

### B. Attorney's Fees

With regard to the circuit court's ruling on attorney's fees, Schlegel argues not only that the Bank was not entitled to "any" attorney's fees, but also that the award of 20 percent of the funds at issue was "speculative, excessive, and unreasonable."  Schlegel also asserts that the circuit court erred in ruling that he was responsible for paying 95 percent of the attorney's fee award.

As the circuit court noted, we held in Pettus that

> when the plaintiff in the interplea has acted in good faith, and has grounds upon which to base his call for the interposition of a court of equity, requiring the adverse claimants to interplead, he is entitled to his costs out of the fund in his hands or which he may pay into the court.  And these costs may include an attorney's fee.

113 Va. at 332, 74 S.E. at 194 (quoting Woodmen of the World v. Wood, 75 S.W. 377, 378 (Mo. Ct. App. 1903)).  Contrary to Schlegel's argument, the principle announced in Pettus remains valid.  Applying that principle, we cannot

16

say that the circuit court abused its discretion in deciding that the Bank was entitled to an award of attorney's fees. Considering the controversy between Schlegel and Grieb about the ownership of Piedmont and its assets, the Bank had grounds for filing its cross-bill for interpleader.

We do not, however, reach the same conclusion with regard to the amount of the award. Upon reviewing the Bank's invoices itemizing its expenses for attorney's fees, we find entries that relate solely to attorney's fees incurred by the Bank for litigating the issues raised in Schlegel's bill of complaint as opposed to the Bank's cross-bill for interpleader. For example, an entry for January 27, 2003 pertained to a conference concerning how to respond to Schlegel's motion for leave to amend his bill of complaint. As another example of many such entries, the Bank claimed attorney's fees on April 27, 2004 for studying law review articles about Article 4A's exclusivity.

A party requesting an award of attorney's fees must establish a prima facie case that the fees requested are reasonable. Chawla v. BurgerBusters, Inc., 255 Va. 616, 623, 499 S.E.2d 829, 833 (1998). In deciding whether a party has shown the reasonableness of the fees,

17

the fact finder may consider, <u>inter alia</u>, the time and effort expended by the attorney, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained, whether the fees incurred were consistent with those generally charged for similar services, and whether the services were necessary and appropriate.

<u>Id.</u> In the present case, the Bank did not carry its burden to establish "to a reasonable degree of specificity those attorneys' fees associated with its [interpleader]." <u>Ulloa v. QSP, Inc.</u>, 271 Va. 72, 83, 624 S.E.2d 43, 50 (2006). Although the circuit court did not award the full amount of attorney's fees requested because the Bank incurred many of the fees in defending against Schlegel's claims, the court nevertheless did not determine whether the amount awarded represented compensation for services that were "necessary and appropriate" to the cross-bill for interpleader. <u>Chawla</u>, 255 Va. at 623, 499 S.E.2d at 833. Thus, we conclude that the circuit court abused its discretion in awarding attorney's fees to the Bank in the amount of 20 percent of the funds at issue.[3]

We likewise conclude that the circuit court abused its discretion in directing that 95 percent of the attorney's

---

[3] The Bank argues that it was also entitled to an award of attorney's fees pursuant to the deposit agreement with Piedmont. The terms of the deposit agreement do not change our conclusion that the circuit court abused its discretion in determining the amount of the award.

18

fees awarded be deducted from Schlegel's portion of the funds. The circuit court believed that Schlegel was responsible for the Bank's incurring the majority of the attorney's fees because he protracted the litigation by filing numerous "ungrounded motions." The court, however, did not relate how those motions protracted resolution of the narrow issues involved in the cross-bill for interpleader in light of the fact that Schlegel and Grieb had reached a settlement that divided the funds at issue equally between them. The order memorializing that settlement required the custodian for Piedmont to pay all outstanding expenses of Piedmont and then distribute the funds at issue to Schlegel and Grieb. While the Bank's expenditures for attorney's fees might not have been an outstanding expense of Piedmont at the time the settlement order was entered, we find no reason why the award of attorney's fees should not be paid in the same manner, i.e. by paying whatever amount is awarded to the Bank and then distributing the remaining funds equally between Schlegel and Grieb.

### III. CONCLUSION

In summary, the circuit court did not err in concluding that Code § 8.4A-204(a) preempted Schlegel's common law claims arising from the alleged unauthorized

payment orders.  The circuit court, however, did err in finding that Code § 8.4A-204(a) preempted Schlegel's common law claims for conversion and breach of contract arising from the Bank's failure to return the funds to Piedmont's bank account after it learned of the alleged unauthorized payment orders and the Bank's alleged continuing dominion and control over the transferred funds.

With regard to the award of attorney's fees, we conclude that the circuit court did not abuse its discretion in finding that the Bank is entitled to an award for attorney's fees incurred with respect to its cross-bill for interpleader.  However, the circuit court did abuse its discretion by awarding 20 percent of the frozen funds as attorney's fees and by directing that Schlegel pay 95 percent of the award from his portion of the funds at issue.

For these reasons, we will affirm in part and reverse in part the judgment of the circuit court and remand for further proceedings consistent with this opinion.

Affirmed in part,
reversed in part,
and remanded.

20