NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0015n.06

No. 15-5406

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 08, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TERRY WRIGHT; CHERYL WRIGHT, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CITIZEN'S BANK OF EAST TENNESSEE, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: DAUGHTREY, ROGERS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Cheryl and Terry Wright appeal the grant of summary judgment to Citizens Bank of East Tennessee ("Citizens")[1] in this action arising from the bank's failure to correctly and timely execute Mrs. Wright's instructions to issue a same-day wire transfer to prevent the sale of stock the Wrights held in a margin account. Citizens made a mistake in issuing the wire transfer, causing the wire transfer not to be completed until the next morning, with the result that some of the Wrights' stock was sold to satisfy the margin call. Finding no error, we **AFFIRM**.

**I.**

In 2006, Terry Wright sought to establish a new banking relationship in Hawkins County, Tennessee, where he lived with his wife, Cheryl Wright. One of his primary concerns was that the bank would be able to perform wire transfers because the Wrights maintained various

---

[1] The case caption erroneously lists the Defendant-Appellee as "Citizen**'s** Bank of East Tennessee" due to an error by the Wrights when they filed their Complaint.

accounts in other institutions that would require wire transfers in the event of a margin call. As part of his research, Mr. Wright contacted Citizens and spoke with Brent Price, a vice president. Price informed Mr. Wright that Citizens had trained, experienced personnel who could perform wire transfers in accordance with the Wrights' needs, and had no restrictions or limitations as to its ability to accept, process, or complete wire transfers. After this discussion, the Wrights established a banking relationship with Citizens.

In 2008, the Wrights maintained a margin account with Deutsche Bank Alex. Brown ("Deutsche Bank"), which allowed the Wrights to borrow money against the value of the stock in that account. Deutsche Bank used Pershing, LLC, ("Pershing") as a stock clearinghouse brokerage company. If the portfolio's value dropped below a certain ratio compared to the margin-loan amount, the Wrights were required to transfer money into the account to raise it above the threshold ratio. If the Wrights failed to do so by the deadline given, Pershing would sell some of the Wrights' stock and apply the proceeds to reduce the margin loan in order to maintain the required loan-to-equity ratio in the account. This is referred to as a margin call.

On October 3, 2008, Mr. Wright received an email from Deutsche Bank stating that there was a margin call on the Wrights' account for $9167.08, which had to be paid by October 9, 2008. On October 9, Mrs. Wright went to Citizens' branch in Rogersville, Tennessee, to initiate a wire transfer from the Wrights' checking account to their margin account to cover the margin call. Mrs. Wright told the teller, Kristy Bruner, that she wanted to make a wire transfer and handed Bruner a sheet of paper containing Deutsche Bank's wiring instructions, saying nothing else about the wire transfer. Bruner filled out a wire-transfer form, using the instructions provided by Mrs. Wright. Mrs. Wright glanced at the completed form, which she maintains

Bruner did not ask her to review for accuracy, signed it, thanked Bruner, and left. The wire-transfer form states the following:

> The undersigned agrees that this wire transfer is irrevocable and that [the] sole obligation of [Citizens] is to exercise ordinary care in processing this wire transfer and that it is not responsible for any losses or delays which occur as a result of any party's involvement in processing this wire transfer.

(R. 28-2: C. Wright Dep. Ex. 1, PID 418.) Bruner had, however, made an error in entering the beneficiary's account number and therefore the wire transfer did not go through that day and the funds were returned to Citizens.[2]

The next morning, upon discovering the error and conferring with head teller Starr Manis, Bruner used white out on the wire-transfer form Mrs. Wright had signed the day before, fixed the beneficiary account number, and resent the wire transfer. The second wire attempt was successful. The Wrights assert they did not authorize anyone from Citizens to send the wire transfer on October 10, although they also never informed Citizens that it could not send the wire transfer if it was not completed on October 9.

Mr. Wright was informed by his broker on October 10 that the wire transfer had not been received. When he called Citizens to inquire about the funds, a Citizens representative apologized to Mr. Wright for the error and told him the bank had wired the money that morning. By that time, the Wrights' stock had already been sold. Pershing sold between $50,000 and $80,000 worth of stock because the stock had further decreased in value from the time the Wrights had received the initial margin-call notice.

---

[2] Bruner erroneously listed the name and account number of the ultimate beneficiary (Mr. Wright) on the wire-transfer form without listing the name and account number of the beneficiary (Pershing) as well. The correct way to fill out the form when there is an ultimate beneficiary and a beneficiary is to list the beneficiary and the corresponding account number on the line asking for the beneficiary and, under special instructions, the ultimate beneficiary and the corresponding account number.

The Wrights contend that their finances diminished as a consequence of the margin call: they faced an additional margin call, lost assets through stock sales, were subject to unexpected capital-gains tax, were forced to sell valuable assets for less than they were worth, and were denied refinancing of their mortgage with Citizens. Seeking at least $3 million in damages,[3] the Wrights filed this action alleging negligence based on the October 9 and October 10 wire transfers (Count I); negligent and/or intentional misrepresentation based on Price's statements regarding Citizens' employees' training and abilities (Count II); violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 ("EFTA") (Count III); fraud based on the October 10 wire transfer (Count IV); and punitive damages (Count V). The district court granted summary judgment on all the Wrights' claims and they appeal.

## II.

This court reviews de novo a district court's order granting summary judgment. *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the district court's grant of summary judgment was proper, the court "must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). We review questions of law, including the interpretation of state law, de novo. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).

---

[3] The Wrights received the funds that were transferred on October 10, so those funds are not included in their claimed damages.

## A. Count III

The district court held that the Wrights' EFTA claim was barred by the statute of limitations. Citizens also argues that the EFTA does not apply to the Wrights' claims. Whether the EFTA applies to the Wrights' claims is a threshold issue because Article 4A, which the district court relied on in concluding other claims were displaced, does not apply to most funds transfers governed by the EFTA. *See* Tenn. Code § 47-4A-108(a)–(b) ("[T]his chapter does not apply to a funds transfer any part of which is governed by the Electronic Fund Transfer Act of 1978," except for "a funds transfer that is a remittance transfer as defined in the Electronic Fund Transfer Act, codified in 15 U.S.C.§ 1693*o*-1, as amended from time to time, unless the remittance transfer is an electronic fund transfer as defined in the Electronic Fund Transfer Act, codified in 15 U.S.C. § 1693a, as amended from time to time.").

Under the EFTA, "electronic fund transfer" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). Regulations clarify that the EFTA is not intended to apply to wire transfers through Fedwire or similar systems. 12 C.F.R. § 205.3(c) ("The term electronic fund transfer does not include . . . (3) Wire or other similar transfers. Any transfer of funds through Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses.").

Here, the funds transfers at issue were made through Fedwire. Therefore, the EFTA does not apply. *See Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274 (11th Cir. 2003) ("[T]he provisions of Article 4A, as incorporated to funds transfers using Fedwire via Regulation

J, apply to the circumstances before us."); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223 (4th Cir. 2002) ("The rules adopted from Article 4A serve as the exclusive means for determining the rights, duties and liabilities of all parties involved in a Fedwire funds transfer.").

Accordingly, we affirm the grant of summary judgment as to count III.

## B. Counts I and IV

### 1. Article 4A of the Tennessee Uniform Commercial Code

The district court held that Article 4A of the Tennessee Uniform Commercial Code displaces Counts I and IV. Article 4A governs certain "funds transfers."[4] Tenn. Code § 47-4A-102. A "funds transfer" is defined as

> the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

Tenn. Code § 47-4A-104(a). A "payment order" is "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary" under certain circumstances that are met here.[5] Tenn. Code § 47-4A-103(a)(1). The "sender" is "the person giving the instruction to

---

[4] "[Article 4A] does not apply to a funds transfer any part of which is governed by the Electronic Fund Transfer Act of 1978," except for "a funds transfer that is a remittance transfer as defined in the Electronic Fund Transfer Act, codified in 15 U.S.C. § 1693*o*-1, as amended from time to time, unless the remittance transfer is an electronic fund transfer as defined in the Electronic Fund Transfer Act, codified in 15 U.S.C. § 1693a, as amended from time to time." Tenn. Code § 47-4A-108(a)–(b). As we have already determined, the EFTA does not apply to any funds transfer at issue here.

[5] Those circumstances are:
(i) The instruction does not state a condition to payment to the beneficiary other than time of payment;
(ii) The receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender; and

the receiving bank." Tenn. Code § 47-4A-103(a)(5). An "originator" is "the sender of the first payment order in a funds transfer." Tenn. Code § 47-4A-104(c). The "receiving bank" is "the bank to which the sender's instruction is addressed." Tenn. Code § 47-4A-103(a)(4). The "beneficiary" is "the person to be paid by the beneficiary's bank," and the "beneficiary's bank" is "the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if the order does not provide for payment to an account." Tenn. Code § 47-4A-103(a)(2)–(3). Here, Mrs. Wright is the originator and Citizens is the originator's bank. Mrs. Wright is also the sender and Citizens is the receiving bank.[6]

Tennessee courts have not addressed whether Article 4A displaces common-law claims with respect to wire transfers. However, the Tennessee Court of Appeals has held that Articles 3 and 4 displace common-law claims relating to transactions covered by those provisions. *See C–Wood Lumber Co. v. Wayne Cnty. Bank*, 233 S.W.3d 263, 281 (Tenn. Ct. App. 2007). In *C–Wood Lumber,* the corporate plaintiff brought claims against the bank after the bank failed to prevent the plaintiff's employee from endorsing and depositing into her personal bank account checks that were made out to the plaintiff. The court explained:

> Articles 3 and 4 of the UCC embody a delicately balanced statutory scheme governing the endorsement, negotiation, collection, and payment of checks. They

---

(iii) The instruction is transmitted by the sender directly to the receiving bank or to an agent, funds-transfer system, or communication system for transmittal to the receiving bank.

Tenn. Code § 47-4A-103(a)(1)(i)–(iii).

[6] Citizens was also the sender when it instructed the beneficiary's bank to make payment to the beneficiary. *See* Tenn. Code § 47-4A-104, cmt. 1 ("**Case #2.** Assume . . . that X instructs Bank A to pay $1,000,000 to Y's account in Bank B. With respect to this payment order, X is the sender, Y is the beneficiary, and Bank A is the receiving bank. Bank A carries out X's order by instructing Bank B to pay $1,000,000 to Y's account. This instruction is a payment order in which Bank A is the sender, Bank B is the receiving bank, and Y is the beneficiary.").

> provide discrete loss-allocation rules uniquely applicable to banks. While this scheme is not comprehensive, it is nearly so. Therefore, courts dealing with "hard cases" should be hesitant to recognize common-law or non-[UCC] claims or to employ common-law or non-UCC remedies in the mistaken belief that they are dealing with one of the rare transactions not covered by the UCC.

*Id.* at 281 (internal citation omitted). The Tennessee court also observed that "a large number of courts have refused to recognize common-law or non-UCC claims in general, and specifically common-law or non-UCC negligence claims or conversion claims, arising from transactions governed by Articles 3 or 4." *Id.* (footnotes omitted). The court concluded that because "[t]he transactions at issue in this case fall squarely within the scope of Articles 3 and 4," "C–Wood's claims against the bank and the scope of the remedies available to C–Wood are governed solely by the UCC." *Id.* at 281–82.

To support its conclusion that the UCC exclusively governed the claims at issue in *C–Wood*, the court relied on the official comment to the UCC in explaining that "while generally applicable principles of law and equity can be used to supplement the UCC, they may not be used to supplant the UCC's provisions or the purposes or policies these provisions." *Id.* at 281 (citing UCC § 1-103 cmt. 2). Article 4A contains a separate comment regarding displacement of common-law claims:

> Funds transfers involve competing interests--those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

Tenn. Code § 47-4A-102 cmt.

Consistent with this comment, several of our sister circuits have held that Article 4A displaces common-law claims relating to wire transfers if the claims arise out of a situation addressed by Article 4A or attempt to create rights, duties, or liabilities inconsistent with Article 4A. For example, in *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 87, 89–90 (2d Cir. 2010), the Second Circuit affirmed summary judgment in favor of the bank on the plaintiff's common-law claims—including fraud and negligence claims—stemming from allegedly unauthorized wire transfers. The court explained that "[f]or Article 4A purposes, the critical inquiry is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim." *Id.* The court rejected the plaintiff's argument that Article 4A does not displace common-law claims to which it does not expressly refer because "Article 4A's text strongly suggests that it applies to claims asserting the existence of unauthorized wire transfers regardless of what the claims may be called and, in any event, the accompanying commentary is pellucid on the issue." *Id.* at 90; *see also Patco Const. Co., Inc. v. People's United Bank*, 684 F.3d 197, 216 (1st Cir. 2012) (affirming summary judgment of negligence claim based on Article 4A displacement because "the standard for the duty of care as to both sides is set forth in Article 4A and its limitation of liability"); *cf. Regions Bank*, 345 F.3d at 1275 (explaining that "the only restraint on a plaintiff is that 'resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities *inconsistent* with those stated in this Article'" and holding that because "Article 4A is silent with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known that the funds were fraudulently obtained," a state law claim based on such a theory was not displaced (quoting UCC § 4A-102 cmt.)).[7]

---

[7] When the wire transfers are made through Fedwire, separate federal regulations apply. *See* 12 C.F.R. §§ 210.25–210.32. Those regulations incorporate Article 4A, so the analysis would be the

Several state courts have likewise held that claims arising out of situations addressed by Article 4A are displaced. *See, e.g.*, *Fitts v. AmSouth Bank*, 917 So. 2d 818, 824 (Ala. 2005) ("Because the situation made the basis of the Fittses' common-law claims—that AmSouth made an improper funds transfer—is unequivocally addressed in the particular provisions of Article 4A, we conclude that those common-law claims are displaced by Article 4A and that the Fittses' exclusive remedy for that claim must be found in Article 4A."); *Schlegel v. Bank of Am., N.A.*, 628 S.E.2d 362, 365–68 (Va. 2006) (affirming summary judgment against bank's customer on common-law claims based on unauthorized payment orders because "[t]he alleged unauthorized payment orders are a situation covered by the particular provisions of [Article 4A] and the remedy Schlegel seeks in his common law claims would conflict with the statutory remedy," but reversing summary judgment on claims involving the freezing of funds without refund because that was "not a situation covered by any of the particular provisions" of Article 4A (internal quotation marks and citations omitted)).

The comment to Article 4A and the reasoning above are persuasive. Accordingly, we examine the Wrights' claims to see if they arise out of a situation covered by the provisions of Article 4A, and whether they attempt to create rights, duties, and liabilities inconsistent with Article 4A.

### 2. Counts I and IV are displaced by Article 4A

The Wrights allege that Citizens was negligent in its preparation of the October 9 wire transfer and acted negligently and fraudulently in issuing the October 10 wire transfer. The district court properly found that "what actually took place was a delayed wire transfer" as

---

same in this case. *See id.* § 210.25(b)(1); *Regions Bank*, 345 F.3d at 1274.

contemplated by Tennessee Code Section 47-4A-305, and on that basis held that Counts I and IV

are displaced.[8]  (R. 29: Mem. Op. & Order, PID 480.)

Section 47-4A-302 provides, in pertinent part,

(a) Except as provided in subsections (b)-(d), if the receiving bank accepts a payment order pursuant to § 47-4A-209(a),[9] the bank has the following obligations in executing the order:

(1) **The receiving bank is obliged to issue, on the execution date, a payment order complying with the sender's order** and to follow the sender's instructions concerning:
> (i) Any intermediary bank or funds-transfer system to be used in carrying out the funds transfer; or
> (ii) The means by which payment orders are to be transmitted in the funds transfer.

If the originator's bank issues a payment order to an intermediary bank, the originator's bank is obliged to instruct the intermediary bank according to the instruction of the originator.  An intermediary bank in the funds transfer is similarly bound by an instruction given to it by the sender of the payment order it accepts.

Tenn. Code § 47-4A-302 (emphasis added).

Section 47-4A-305 provides, in pertinent part,

(a) **If a funds transfer is completed but execution of a payment order by the receiving bank in breach of § 47-4A-302 results in delay in payment to the beneficiary**, the bank is obliged to pay interest to either the originator or the beneficiary of the funds transfer for the period of delay caused by the improper execution.  Except as provided in subsection (c), additional damages are not recoverable.

(b) **If execution of a payment order by a receiving bank in breach of § 47-4A-302 results in:**
> **(i) Noncompletion of the funds transfer;**

---

[8] The district court held that it need not address whether the Wrights are entitled to damages pursuant to Article 4A because the Wrights did not raise any Article 4A claims.  The Wrights do not challenge this holding on appeal.

[9] Section 47-4A-209(a) provides that, "[s]ubject to subsection (d), a receiving bank other than the beneficiary's bank accepts a payment order when it executes the order."  A payment order is executed when the receiving bank "issues a payment order intended to carry out the payment order received by the bank." Tenn. Code § 47-4A-301.

> (ii) Failure to use an intermediary bank designated by the originator; or
>
> **(iii) Issuance of a payment order that does not comply with the terms of the payment order of the originator,**

the bank is liable to the originator for its expenses in the funds transfer and for incidental expenses and interest losses, to the extent not covered by subsection (a), resulting from the improper execution. Except as provided in subsection (c), additional damages are not recoverable.

(c) In addition to the amounts payable under subsections (a) and (b), damages, including consequential damages, are recoverable to the extent provided in an express written agreement of the receiving bank.

Tenn. Code § 47-4A-305 (emphasis added).

As the emphasized portions establish, Article 4A addresses situations where a receiving bank fails to comply with the sender's order (Section 47-4A-302(a)(1)), resulting in either a delay in payment to the beneficiary (Section 47-4A-305(a)), noncompletion of the funds transfer (Section 47-4A-305(b)(i)), or issuance of a noncompliant payment order (Section 47-4A-305(b)(iii)). Here, Citizens first attempted to complete the funds transfer using Mr. Wright's ultimate beneficiary account number without including Pershing's beneficiary account number, which resulted in the noncompletion of the funds transfer. The next day, upon realizing the error, Citizens reissued the payment order using the correct beneficiary account information, and the wire transfer was successful, albeit delayed. Thus, Article 4A covers the factual scenario presented here. Accordingly, the Wrights' common-law claims based on the October 9 and October 10 wire transfers, which seek to impose consequential damages on the bank contrary to the provisions of Article 4A, are displaced by Article 4A.

The Wrights resist this holding on two grounds. First, they argue that, as to the October 9 transfer, the wire-transfer process did not begin with Mrs. Wright's written and oral instructions to Bruner to complete the wire transfer. Rather, the Wrights contend, this was simply preparation for the wire transfer, which is not covered by Article 4A. Thus, the Wrights argue

that Bruner assumed a duty of care to complete the wire-transfer form properly, that she breached that duty by failing to do so, and that her breach is not covered by Article 4A.

However, the Wrights' argument is contrary to the plain language of Article 4A. A "funds transfer" is defined as "the series of transactions, **beginning with the originator's payment order**, made for the purpose of making payment to the beneficiary of the order." Tenn. Code § 47-4A-104(a) (emphasis added). A "payment order" is defined as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary" under certain circumstances that are met here. Tenn. Code § 47-4A-103(a)(1). Thus, the funds transfer began when Mrs. Wright gave oral and written instructions to Bruner to perform a wire transfer.

Regarding the October 10 wire transfer, the Wrights argue that Bruner created a fraudulent wire-transfer form to wire funds that were unauthorized by the Wrights in order to cover up her mistake from the previous day, and that this activity is unrelated to the mechanics of the wire-transfer process and therefore properly the subject of common-law liability. The Wrights cite several cases where courts have found that Article 4A does not displace certain claims. *See Regions Bank*, 345 F.3d at 1275–79 (holding that the bank would have acted outside of Article 4A's scope if it accepted funds through a wire transfer that the bank knew or should have known were obtained illegally); *Sheerbonnet v. Am. Express Bank, Ltd*, 951 F. Supp. 403, 405–06 (S.D.N.Y. 1995) (holding that claims based on the receiving bank transferring funds to a bank account that it knew was frozen and then asserting its rights over the frozen account as an offset against debts owed to it by the insolvent bank were not displaced); *Koss Corp. v. Am. Express Co.*, 309 P.3d 898, 901–02, 906 (Ariz. Ct. App. 2013) (holding that claims based on the bank applying funds knowing those funds had been embezzled were not displaced); *Schlegel*,

628 S.E.2d at 368 (holding that Article 4A did not displace common-law claims relating to the freezing of the funds without refunding them to the plaintiff's bank account).

There is no inconsistency between these cases and our conclusion that Counts I and IV are displaced. In each of these cases, the alleged harm was the result of activity beyond the scope of Article 4A, or the case involved allegations that the bank applied funds it knew were illegally obtained, or tortiously enriched itself. The instant case bears no resemblance to these cases. At bottom, the Wrights' claim based on the October 10 wire transfer is simply a case where the teller delayed in correctly completing a wire transfer requested by a customer, a situation addressed by Article 4A. *See Sheerbonnet*, 951 F. Supp. at 412 ("The rules of [Article 4A] are transactional, aimed essentially at resolving conflicts created by erroneous instruction or execution of payment orders, whether by the originator, by an intermediary or receiving bank, or by the beneficiary's bank. . . . Errors may occur during the issuance and acceptance of the payment order—as when a payment order is made for the wrong amount, or identifies the wrong beneficiary, or . . . is untimely cancelled. Errors may also occur during the execution of the payment order by the receiving bank—as when the originator's instructions are not followed, or the order is executed late, or is issued in an improper amount, or is not executed at all.").

Because the Wrights' claims fit squarely within Article 4A, Counts I and IV are displaced by Article 4A, and they are unable to recover the consequential damages they seek.

## C. Count II

Count II alleges negligent and/or intentional misrepresentation. The Wrights rely on alleged representations made by Citizens' Vice President Brent Price when Mr. Wright spoke with him while shopping for a bank. Specifically, Mr. Wright alleges that Price assured him that Citizens had trained, experienced personnel who could execute wire transfers in accordance with

Mr. Wright's needs and that Citizens had no restrictions or limitations as to its ability to accept, process, or complete wire transfers.

"To succeed on a negligent misrepresentation claim, a plaintiff must establish that: (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiffs justifiably relied on the information." *Stanfill v. Mountain*, 301 S.W.3d 179, 189 (Tenn. 2009). A claim for intentional misrepresentation requires that (1) the defendant made a false representation of an existing or past material fact; (2) the false representation was made knowingly or recklessly; (3) the plaintiff reasonably relied on the misrepresentation; and (4) the plaintiff suffered damage as a result of the misrepresentation. *Id.* at 188.

As an initial matter, the district court properly held that Count II was not displaced by Article 4A because it does not deal with a funds transfer. Because Article 4A does not address representations made by a bank representative about the bank personnel's training, experience, or ability to perform wire transfers, Count II is not displaced by Article 4A.

In support of this claim, the Wrights rely on the testimony of Bruner and Manis, who testified generally that they received in-house training and watched others perform wire transfers. Bruner testified that she received oral instructions but did not remember who had trained her. Manis testified that she could not recall anyone telling her how to fill out a wire-transfer form when there was a beneficiary and an ultimate beneficiary listed, but she knew how to do it. The Wrights contend that had they been informed, they would not have considered this training adequate, and they further argue that Bruner's use of white out on the wire-transfer form shows that she was not properly trained.

There is no evidence to suggest, however, that Price's very general representations were false or that he failed to exercise reasonable care when making these representations. The Wrights point to no industry standard to show that the training described by Bruner and Manis was inadequate. And there is no evidence suggesting that there were other impediments to Citizens' completion of wire transfers in accordance with the Wrights' needs. The evidence is insufficient to maintain an intentional or negligent misrepresentation claim. *See McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 131 (Tenn. Ct. App. 1982) ("There is no proof in this record that [a contractor] couldn't build [a property owner's] home according to plans and specifications. The proof is that he didn't do so. This is an enormous difference. Many a contractor has had the requisite skills to timely and correctly complete a project, but for a myriad of reasons did not."). Indeed, Bruner had previously filled out a wire-transfer form and completed a wire transfer for Mr. Wright under analogous circumstances, which suggests that Bruner was properly trained to complete the wire transfer at issue and simply made a mistake on October 9.

We affirm the grant of summary judgment as to Count II.

**D. Count V**

Under Tennessee law, punitive damages are proper only if "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). The Wrights contend that their claim for punitive damages should be remanded if we reverse the grant of summary judgment as to their fraud or intentional misrepresentation claims. But because summary judgment on those claims was proper, the grant of summary judgment as to their request for punitive damages was proper as well.

## III.

For these reasons, we **AFFIRM**.